IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 1738-03






CRAIG ALLEN KOTHE, Appellee



v.



THE STATE OF TEXAS





ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FOURTH COURT OF APPEALS


KENDALL COUNTY





 Cochran, J., delivered the opinion of the unanimous Court. 


O P I N I O N 


 

 Deputy Forslund detained Craig Kothe for suspected DWI. In conjunction with a field
sobriety test, the deputy requested a computer search for outstanding warrants on Mr. Kothe. 
Deputy Forslund determined that Mr. Kothe was not intoxicated, but during or immediately
after the warrant check, he received a dispatch stating that Mr. Kothe might be in possession
of missing property. With Mr. Kothe's consent, the deputy searched the car and found drug
paraphernalia. The deputy then spoke with the passenger, Ms. Brantley, who informed him that
she was carrying heroin at Mr. Kothe's request.

 Two issues are presented in this case. (1) First, does Mr. Kothe have standing to challenge
the deputy's search of the passenger? We hold that, because Mr. Kothe had a reasonable
expectation of privacy in not being subjected to an unduly prolonged detention, he has standing
to challenge the seizure of evidence obtained by exploiting that detention. Second, is the
continued detention of a driver for an additional three to twelve minutes while waiting for the
results of a routine computer driver's license check "reasonable" if the officer's original
articulable suspicion had already been resolved? We hold that, viewed in the totality of the
circumstances, the additional short detention period was not a violation of the Fourth
Amendment. We reverse the judgment of the court of appeals which held that Kothe's
continued detention was constitutionally unreasonable. (2)


I.A. Factual Background


 During the evening of July 24, 2001, Kendall County Deputy Forslund was on routine
patrol when he received a radio dispatch about a possibly intoxicated driver. The dispatcher
said that someone driving a red Jeep behind the car had called in the report. Shortly thereafter,
Deputy Forslund spotted the described car pulling into a highway rest stop. The deputy pulled
up behind the car, radioed in the license plate number, approached the driver, Mr. Craig Kothe,
and asked for his driver's license. 

 Deputy Forslund conducted a field sobriety test of Mr. Kothe, in conjunction with
running a driver's license and warrant check. The deputy concluded that Mr. Kothe was not
intoxicated and returned to his patrol car to wait for the results on the warrant check. The
check showed no outstanding warrants. Just as Deputy Forslund prepared to release Mr. Kothe,
he received a second dispatch which described Mr. Kothe and his car. The dispatcher stated
that the sheriff's office had received a teletype earlier in the day that Mr. Kothe might be in
possession of a blue bank bag containing old silver coins taken from someone's household
safe. The Fredericksburg police teletype requested that officers retrieve the bank bag and
coins, but not arrest Mr. Kothe.

 At this point, Deputy Forslund approached Mr. Kothe's car and asked him about the bag
and coins. Mr. Kothe said that there was no blue bag in his car. Deputy Forslund asked: "Do
you mind if I search? Do you mind if I look?" Mr. Kothe said, "No," and filled out a written
consent to search form. Deputy Forslund then looked in the front console of the car and found
drug paraphernalia, but no blue bank bag. After finding the paraphernalia, the deputy questioned
the passenger, Mr. Kothe's girlfriend, Jennifer Brantley. She was acting very nervous and said
that she had two baggies of heroin, which Mr. Kothe had asked her to hold, in her bra. She
handed over the baggies, and Officer Forslund arrested Mr. Kothe and Ms. Brantley for
possession of heroin and drug paraphernalia. 

 After Mr. Kothe was indicted for possession of a controlled substance, he filed a
motion to suppress the heroin, claiming that Deputy Forslund's continued detention of him
after the deputy had determined that Mr. Kothe was not intoxicated was constitutionally
unreasonable and illegal. The motion focused on the estimated three to twelve minute period
between the moment that Deputy Forslund determined Mr. Kothe was not intoxicated and the
time he re-approached Mr. Kothe to ask about the blue bank bag. (3) After hearing the evidence,
the trial court orally granted the suppression motion and later filed written Findings of Fact and
Conclusions of Law. (4) The State appealed.

B. The Court of Appeals' Opinion


 Initially, the San Antonio Court of Appeals reversed the trial court's ruling, but, on
rehearing, it withdrew its prior opinion and substituted one affirming the trial court's
suppression order. 

 As for the standing issue, the court of appeals agreed with the State that Mr. Kothe
would normally lack standing to complain about the search of Ms. Brantley. The court held
that, in this case however, the search issue was "transcended by the illegal detention." (5) 
However, the court of appeals concluded that, because of Mr. Kothe's prolonged detention,
all of the evidence seized thereafter was tainted by that initial illegality.

 In assessing whether Mr. Kothe's Fourth Amendment rights were violated by his
continued detention, the court of appeals deferred to the trial court's determination of facts
and rulings on mixed questions of law and fact. The court applied an abuse of discretion
standard of review to the trial court's legal, as well as his factual, findings. Stating that "[t]hese
are findings we cannot disturb on appeal," the court held that Deputy Forslund's conduct was
unreasonable under the circumstances and violated the Fourth Amendment. (6) II.

 Before addressing whether Mr. Kothe's Fourth Amendment rights were violated by the
continued detention, we must first assess whether Mr. Kothe has standing to complain about
the seizure of the heroin. Mr. Kothe has standing to contest the search only if he had a
reasonable personal expectation of privacy that he claims was violated.

A. Standing

 Proof of "a reasonable expectation of privacy" is at the forefront of all Fourth
Amendment claims. Any defendant seeking to suppress evidence obtained in violation of the
Fourth Amendment must first show that he personally had a reasonable expectation of privacy
that the government invaded. (7) He must prove that he was a "victim" of the unlawful search or
seizure. (8) He has no standing to complain about the invasion of someone else's personal
rights. (9) Only after a defendant has established his standing to complain may a court consider
whether he has suffered a substantive Fourth Amendment violation. (10) Although we defer to the
trial court's factual findings and view them in the light most favorable to the prevailing party,
we review the legal issue of standing de novo. (11)

 In this case, the State failed to challenge Mr. Kothe's standing to complain about the
present search or seizure in the trial court. Mr. Kothe argues that the State cannot raise the
issue on appeal in the context of a warrantless search when the State was the losing party in the
trial court. We disagree. This Court has previously stated that, because standing is an element
of a Fourth Amendment claim, the State may raise the issue of standing for the first time on
appeal, even when the defendant is the prevailing party in the trial court. (12) The appellate court
may raise the issue of standing on its own; (13) it may analyze that issue as a part of the Fourth
Amendment claim presented; (14) or it may conclude that the State has forfeited that argument
because it failed to raise it in the trial court. (15) In this case, the court of appeals did address the
State's complaint concerning Mr. Kothe's standing and concluded:

 Although we agree Kothe has no standing to complain about any search
and seizure conducted against Brantley, that issue is transcended by the illegal
detention that was found to have occurred earlier. The trial court ruled that all
of the evidence seized, including the two baggies of heroin taken from Brantley,
was tainted because it was obtained during the illegal detention. (16)


The court of appeals is correct in its conclusion on standing. 

 In addressing standing, "it is critical that the precise police conduct being objected to
be properly identified, for this may itself turn out to be determinative on the standing issue." (17) 
In this case, the State argues that Mr. Kothe had no reasonable expectation of privacy in the two
balloons of heroin secreted in Ms. Brantley's bra. True enough. Mr. Kothe cannot complain
about a search of Ms. Brantley. But that is not the basis of his complaint. 

 Rather, Mr. Kothe's Fourth Amendment claim is based upon a purportedly prolonged
detention of himself as the driver of his car. He argues that, although Deputy Forslund initially
had articulable suspicion to detain him, once the deputy determined that Mr. Kothe was not
intoxicated, any further detention, without articulable suspicion of some other crime, violated
the Fourth Amendment. He claims that the later search of Ms. Brantley was made by
exploiting that initial illegality, and it is "fruit of the poisonous tree" of the violation of Mr.
Kothe's personal Fourth Amendment right to be free from unreasonable seizures. (18)

 The testimony in this case establishes that both Mr. Kothe and Ms. Brantley had a
reasonable expectation of privacy in the right to be free from an illegal detention. "The
intrusion a vehicle stop causes is personal to those in the car when it occurs." (19) As explained
by Professor LaFave:

 If either the stopping of the car or the passenger's removal from it are
unreasonable in a Fourth Amendment sense, then surely the passenger has
standing to object to those constitutional violations and to have suppressed any
evidence found in the car which is their fruit. (Quite obviously, a driver
nonowner likewise has standing regarding the stopping of the vehicle or his
removal from it). (20) 


Both Mr. Kothe and Ms. Brantley had a reasonable expectation of privacy in not being detained
beyond the time necessary for Officer Forslund to complete his investigation. Thus, Mr.
Kothe has standing to complain about any illegally prolonged detention. (21) If Officer Forslund's
conduct in awaiting the results of the computer license and warrant check was "unreasonable"
under the Fourth Amendment, Mr. Kothe has standing to complain about the subsequent search
of Ms. Brantley. That search is "fruit of the poisonous tree" if it constituted an exploitation
of the illegal detention. (22)

 We turn, then, to the question of whether Officer Forslund's conduct in awaiting the
results of the license and warrant check was "unreasonable" under the Fourth Amendment. 

B. "Reasonable" Detentions under the Fourth Amendment

 Did Deputy Forslund's conduct in awaiting the results of the license and warrant check,
after determining that Mr. Kothe was not intoxicated, violate Mr. Kothe's reasonable
expectation of privacy? Conversely, was the deputy's behavior constitutionally "reasonable"
under the totality of the circumstances?

 On appeal, the question of whether a specific search or seizure is "reasonable" under
the Fourth Amendment is subject to de novo review. (23) Despite its fact-sensitive analysis,
"reasonableness" is ultimately a question of substantive Fourth Amendment law. (24) It is true
that, in assessing this legal issue, courts give great deference to the trial court's findings of
historical fact. (25) However, questions involving legal principles and the application of law to
established facts are properly reviewed de novo. (26) Thus, in deciding whether Mr. Kothe's
continued detention was "reasonable" under the specific circumstances, we view the trial
court's factual findings in the light most favorable to his ruling, but we decide the issue of
"reasonableness" as a question of Fourth Amendment law under Supreme Court precedent.

 The Supreme Court states that Fourth Amendment "reasonableness" is measured "in
objective terms by examining the totality of the circumstances"; it "eschew[s] bright-line rules,
instead emphasizing the fact-specific nature of the ... inquiry." (27) It requires a balance between
the public interest served and the individual's right to be free from arbitrary detentions and
intrusions. (28) 

 In this case, the court of appeals held that Mr. Kothe's continued detention to await the
results of the license check was "unreasonable" under Terry v. Ohio. (29) A Terry analysis has
two prongs. A court must first decide whether the officer's action was justified at its
inception. (30) Here, both parties agree that Deputy Forslund's initial detention of Mr. Kothe was
based on articulable suspicion of DWI. Therefore, the court of appeals focused on the second
prong of Terry-whether the search and seizure was reasonably related, in scope, to the
circumstances that justified the stop in the first place. (31) 

 In deciding whether the scope of a Terry detention is "reasonable," the general rule is
that an investigative stop can last no longer than necessary to effect the purpose of the stop. (32) 
In other words, if a driver is stopped on suspicion of driving while intoxicated, once the police
officer determines that the driver is not impaired, he should be promptly released. (33) However,
there is an additional component to a routine traffic stop- the license and warrants check. (34) 
On a routine traffic stop, police officers may request certain information from a driver, such
as a driver's license and car registration, and may conduct a computer check on that
information. (35) It is only after this computer check is completed, and the officer knows that this
driver has a currently valid license, no outstanding warrants, and the car is not stolen, that the
traffic-stop investigation is fully resolved. (36) It is at this point that the detention must end and
the driver must be permitted to leave. As Professor LaFave notes:

 It is clear that there are several investigative techniques which may be
utilized effectively in the course of a Terry-type stop. The most common is
interrogation, which may include both a request for identification and inquiry
concerning the suspicious conduct of the person detained. ... Sometimes the
officer will communicate with others, either police or private citizens in an
effort to verify the explanation tendered, to determine if certain property in the
possession of the suspect has been stolen, or to confirm the identification or
determine whether a person of that identity is otherwise wanted. ... There is no
reason to conclude that any investigative methods of the type just listed are
inherently objectionable; they might cast doubt upon the reasonableness of the
detention, however, if their use makes the period of detention unduly long. (37)

 

 In the present case, the court of appeals agreed that "a warrant check in the context of
a traffic stop is generally viewed as a reasonable law enforcement exercise." (38) However, citing
Davis v. State, the court of appeals stated that a warrant check cannot be used solely as a
means to extend a detention "once the reasonable suspicion forming the basis for the stop has
been dispelled." (39) This is consistent with the rationale behind the Supreme Court's
development of Fourth Amendment law. 

 In Ohio v. Robinette, Justice Ginsburg discussed the need to evaluate both the reason
for the initial detention as well as the scope of the detention to ensure that police officers are
not using traffic stops merely as a means to conduct "fishing expeditions." (40) In other words,
once the original purpose for the stop is exhausted, police may not unnecessarily detain
drivers solely in hopes of finding evidence of some other crime. But the Supreme Court has
expressly rejected placing any rigid time limitations on Terry stops; instead, the issue is 
"whether the police diligently pursued a means of investigation that was likely to confirm or
dispel their suspicions quickly, during which time it was necessary to detain the defendant." (41) 
 Further, neither the Fourth Amendment nor the Supreme Court dictate that an officer
making a Terry traffic stop must investigate the situation in a particular order. (42) A traffic stop
may involve both an investigation into the specific suspected criminal activity and a routine
check of the driver's license and car registration. Only if a license check "unduly prolongs"
the detention is the officer's action unreasonable under the circumstances. (43)

 In this case, the court of appeals thought that the order of events was crucial. It found
that because Deputy Forslund did not initiate the warrant check until after he had determined
that Mr. Kothe was not intoxicated, the deputy impermissibly extended the detention. (44) 

 First, the court of appeals was mistaken as to the order of events. Although the trial
judge's findings of fact state: "a routine drivers license check was initiated, in conjunction
with a field sobriety test," his later findings clarified this statement: (45) Deputy Forslund approached the defendant/driver of the vehicle, obtained
the defendant's drivers license, and ran a routine computer check. While
this check was being conducted, the officer conducted one field
sobriety check (the horizontal gaze nystagmus test), following which it
was determined that the defendant was not intoxicated. 

The trial court did not find that the deputy initiated the warrant check after determining that Mr.
Kothe was sober. Rather, Deputy Forslund merely awaited the results of the warrant check that
was already underway when he determined that Mr. Kothe was not intoxicated. Therefore, it
is highly unlikely that Deputy Forslund was using the warrant check solely as means to
purposely extend the detention. Rather, he was simply completing a regular component of a
routine traffic stop. 

 Second, the order of events, while relevant to the legal determination of
"reasonableness," is not in itself determinative. As the en banc Fifth Circuit recently held in
Brigham, "Computerized license and registration checks are an efficient means to investigate
the status of a driver and his auto, but they need not be pursued to the exclusion of, or in
particular sequence with, other efficient means." (46) Fourth Amendment "reasonableness" does
not require a "single, formulaic approach" to a traffic stop investigation, nor does it require
rigid adherence to "the least intrusive means" of investigation defined by Monday-morning
reviewing courts. (47)

 In the present case, there is no evidence-or even suggestion-that Deputy Forslund
failed to diligently pursue his investigation. Nor is there any evidence that Officer Forslund
ran the license check as a pretext to investigate an unrelated crime for which he had no
reasonable suspicion. There is no suggestion that he engaged in any "fishing expedition." 
Quite the contrary, the trial judge in his factual findings was careful not to give that impression. 
This is not an instance of an indefatigable Inspector Javier mercilessly pursuing, harassing, and
hounding his quarry through Paris sewers or Kendall County highways by concocting excuses
to detain him. 

 Viewing the totality of the circumstances in the light most favorable to the trial court's
factual findings, Deputy Forslund's decision to return to his vehicle and simply wait a few
minutes for the warrant-check results before releasing Mr. Kothe was "reasonable" as a matter
of substantive Fourth Amendment law.

 In addition to the period of time discussed above, there is another period that must be
assessed for reasonableness. We must determine if Deputy Forslund acted "reasonably" when
he remained in his vehicle after receiving notice from the dispatcher that Mr. Kothe had no
outstanding warrants but before receiving the second dispatch. It is unclear exactly how long
this period was. During the pretrial hearing, Deputy Forslund stated that he was waiting on the
driver's license return when the dispatcher informed him of the need to talk with Mr. Kothe
about the missing bank bag. However, in his factual findings, Judge Ables states that "the
officer testified that he was just about to release the defendant to leave, when a second teletype
was brought to his attention." Either way, it appears that Deputy Forslund received the second
dispatch, if not before completing the warrant check, almost instantaneously with it. Again,
there is no testimony or insinuation that Deputy Forslund was purposefully prolonging Mr.
Kothe's detention. 

 In conclusion, Deputy Forslund's actions were "reasonable" under the circumstances,
and the detention as a whole was "reasonable." Since neither the initial stop nor its duration
violated the Fourth Amendment, Mr. Kothe's consent to search his car was not
unconstitutionally tainted. The evidence gathered from his car need not be suppressed under
the Fourth Amendment. (48) We therefore reverse the decision by the court of appeals and
remand the case to the trial court for proceedings consistent with this opinion. 

Cochran, J.

Delivered: October 20, 2004.

Publish
1. We granted the State's petition to review the following questions:

 1) Does an appellate court err by holding that the defendant's lack of standing is
"transcended" by an earlier illegal detention?

 2) Where an officer, following a valid traffic stop, resolves the original detention issue, is
the continued detention of the driver, while waiting on the return of a routine computer
driver's license check, reasonable?
2. State v. Kothe, 123 S.W.3d 444, 448 (Tex. App. - San Antonio 2003).
3. In his testimony, Deputy Forslund was himself uncertain about the amount of time that elapsed
between the events; he agreed with the questioners' different suggested times.
4. The trial judge first obtained written proposed findings from both the defense and the State. 
He then held a special hearing in which he, the defense, and the State together compiled an agreed set
of Findings of Fact and Conclusions of Law. It is apparent from this commendable process that Judge
Ables carefully reflected on the precise words that he chose.
5. Kothe, 123 S.W.3d at 449. 
6. Id. at 448.
7. See Rakas v. Illinois, 439 U.S. 128, 139 (1978) (noting that issue of standing involves two
inquiries: first, whether defendant has alleged an "injury in fact"; and second, "whether the proponent is
asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third
parties"). "Fourth Amendment rights are personal rights which, like some other constitutional rights,
may not be vicariously asserted." Alderman v. United States, 394 U.S. 165, 174 (1969).
8. See generally 5 Wayne R. LaFave, Search and Seizure §11.3, at 118 (3d ed. 1996).
9. United States v. Salvucci, 448 U.S. 83, 84-85 (1980); Villarreal v. State, 708 S.W.2d
845, 849-50 (Tex. Crim. App. 1986).
10. See Villareal v. State, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996); United States v.
Pierce, 959 F.2d 1297, 1303 (5th Cir. 1992); United States v. Brazel, 102 F.3d 1120, 1147 (11th
Cir. 1997) Because warrantless searches and seizures are presumed to be unreasonable, the
prosecution must establish that any search or seizure was justified under an exception to the warrant
requirement. Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971). 
11. State v. Johnson, 896 S.W.2d 277, 285 (Tex. App.-Houston [1st Dist.] 1995), aff'd, 939
S.W.2d 586 (Tex. Crim. App. 1996); see United States v. Phillips, ___ F.3d ___, __, 2004 U.S.
App. LEXIS 17274 *9 (5th Cir. 2004) (noting that "[w]hether a defendant has standing to contest an
allegedly illegal search is a question of law" and is reviewed de novo); United States v. DeLuca, 269
F.3d 1128, 1131 (10th Cir. 2001) (stating that courts review de novo the issue of whether a defendant
has standing to challenge a search).
12. State v. Klima, 934 S.W.2d 109, 110-11 (Tex. Crim. App. 1996).
13. See State v. Brady, 763 S.W.2d 38, 42 (Tex. App. - Corpus Christi 1988, no pet.)
(addressing issue of defendant's standing to challenge search although not raised by either State or
defendant in trial or appellate court).
14. See Klima, 934 S.W.2d at 110-11.
15. See, e.g., United States v. Price, 54 F.3d 342, 346 (7th Cir. 1995) (stating that "[b]ecause
Rakas' principle of 'standing' is rooted in the substantive law of the Fourth Amendment and not Article
III [jurisdiction of courts], the government may waive these types of standing objections") (citation
omitted); see also United States v. DeGasso, 369 F.3d 1139, 1143 n.3 (10th Cir. 2004) (concluding
that standing issue was waived because government had never raised it).
16. Kothe, 123 S.W.3d at 448-49.
17. 5 LaFave, § 11.3, at 120.
18. See Wong Sun v. United States, 371 U.S. 471 (1963). In Wong Sun, federal narcotics
agents illegally entered Blackie Toy's closed laundry and arrested him in his adjacent living quarters. In
response to "on-the-spot" questioning, Toy said that he did not have any narcotics, but that Johnny Yee
did. The officers then went to Yee's house, arrested him and found heroin that Yee claimed had come
from both Toy and Wong Sun. The Supreme Court held that Toy would not have standing to complain
about any invasion of Yee's rights, but that Toy did have standing to complain about the officers'
conduct in entering his laundry and arresting him. Exploitation of that illegal conduct led to Yee and
made the heroin obtained from Yee the "fruit of the poisonous tree" of the violation of Toy's Fourth
Amendment rights. Id. at 488. Thus, Toy had standing to complain about any evidence acquired from
the exploitation of his illegal seizure. Wong Sun, however, had no standing to complain about the
violation of Toy's Fourth Amendment rights; he could complain only about a violation of his personal
rights. Id. at 492. And, because Wong Sun's privacy rights were not invaded, he, unlike Toy and Yee,
had no standing to challenge use of the evidence.
19. United States v. Powell, 929 F.2d 1190, 1195 (7th Cir. 1991) (collecting cases and
concluding that passengers, as well as drivers, have standing to challenge a vehicle stop or prolonged
detention); see also United States v. Woodrum, 202 F.3d 1, 6 (1st Cir. 2000) (citing Rakas and
holding that "each occupant of a car has a right to challenge the propriety of a traffic stop under the
Fourth Amendment"); United States v. Roberson, 6 F.3d 1088, 1091 & n.6 (5th Cir. 1993)
("[w]hereas the search of an automobile does not implicate a passenger's fourth amendment rights, a
stop results in the seizure of the passenger and driver alike. Thus, a passenger of a stopped automobile
does have standing to challenge the seizure as unconstitutional"); United States v. Erwin, 875 F.2d
268, 269, n. 2 (10th Cir. 1989) (citing Wong Sun and holding that "even if defendant lacks standing to
challenge the search of the car, if the initial stop was illegal, the seized contraband is subject to exclusion
under the 'fruit of the poisonous tree' doctrine"); State v. Harms, 233 Neb. 882, 884-87, 449
N.W.2d 1, 4 (1989) (collecting cases and concluding that an occupant of a vehicle will ordinarily have
a legitimate expectation to be free of unreasonable governmental intrusion which gives the occupant
standing to challenge the stop as violative of his Fourth Amendment rights); State v. DeMasi, 419 A.2d
285 (R.I.1980), vacated on other grounds, 452 U.S. 934 (1981) (holding that all occupants of the
vehicle had standing to challenge the constitutionality of the stop because "all three shared a legitimate
expectation that they would be free from unreasonable governmental intrusion occasioned by the stop,
the request for identification, and the warrant check. To hold otherwise here would be to draw
artificial, formalistic distinctions not grounded in logic").
20. 5 LaFave, § 11.3(e), at 173-74.
21. See United States v. Brigham, 382 F.3d 500, 506 n.3 (5th Cir. 2004) ("[t]he Government
does not dispute [defendant's] standing, as the vehicle's driver, to attack the constitutionality of the
search" based upon a claim of a prolonged detention).
22. See Wong Sun, 371 U.S. at 487-88 (stating that "[w]e need not hold that all evidence is 'fruit
of the poisonous tree' simply because it would not have come to light but for the illegal actions of the
police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary
illegality, the evidence to which instant objection is made has been come at by exploitation of that
illegality or instead by means sufficiently distinguishable to be purged of the primary taint'") (citation
omitted); see also Crosby v. State, 750 S.W.2d 768, 780 (Tex. Crim. App. 1987) (applying Wong
Sun "fruit of the poisonous tree" doctrine); United States v. Portillo-Aguirre, 311 F.3d 647, 658 (5th
Cir. 2002) (noting that "[u]nder the fruit of the poisonous tree doctrine, all evidence derived from the
exploitation of an illegal seizure must be suppressed, unless the government shows that there was a
break in the chain of events sufficient to refute the inference that the evidence was a product of the
Fourth Amendment violation").
23. See United States v. Ornelas, 517 U.S. 690, 691 (1996) ("[w]e hold that the ultimate
questions of reasonable suspicion and probable cause to make a warrantless search should be
reviewed de novo"); United States v. Sargent, 319 F.3d 4, 8 (1st Cir. 2003) ("[t]his court reviews de
novo the ultimate conclusion as to whether a search was reasonable within the meaning of the Fourth
Amendment"); United States v. Flynn, 309 F.3d 736, 738 (10th Cir. 2002) ("[w]e review de novo
the ultimate question of whether a search or seizure was reasonable under the Fourth Amendment");
United States v. Spikes, 158 F.3d 913, 922-23 (6th Cir. 1998).
24. See United States v. Sharpe, 470 U.S. 675, 682 (1985) (stating "[t]he Fourth Amendment
is not, of course, a guarantee against all searches and seizures, but only against unreasonable searches
and seizures"); Guzman v. State, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997); United States v.
Valadez, 267 F.3d 395, 397 (5th Cir. 2001); United States v. Jones, 234 F.3d 234, 239 (5th Cir.
2000).
25. See Ornelas, 517 U.S. at 699 (noting that "a trial judge views the facts of a particular case in
light of the distinctive features and events of the community; likewise, a police officer views the facts
through the lens of his police experience and expertise. The background facts provide a context for the
historical facts, and when seen together yield inferences that deserve deference"). In this case, Judge
Ables, with the assistance of both the defense and prosecution, prepared thorough, helpful, and specific
written findings of facts despite the witness's less than clear testimony.
26. Ornelas, 517 U.S. at 691; Walter v. State, 28 S.W.3d 538, 540 (Tex. Crim. App. 2000).
27. Ohio v. Robinette, 519 U.S. 33, 39 (1996).
28. See Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977) (per curiam).
29. Kothe, 123 S.W.3d at 447 (citing Terry v. Ohio, 392 U.S. 1 (1968)).
30. Terry, U.S. at 19-20. 
31. Kothe, 123 S.W.3d at 447. 
32. Florida v. Royer, 460 U.S. 491, 500 (1983) (stating the "[t]he scope of the detention must
be carefully tailored to its underlying justification").
33. Davis v. State, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997).
34. Id. at n.6; see also Walter v. State, 28 S.W.3d 538, 542 (Tex. Crim. App. 2000).
35. United States v. Brigham, 382 F.3d (5th Cir. 2004) (en banc). In Brigham, as in this case,
the defendant was initially detained for a suspected traffic violation and did not challenge the validity of
that stop. Id. at 506. Rather, Brigham argued that the officer "exceeded the scope of the valid stop
and prolonged the occupants' detention excessively" in awaiting the results of a computer license and
warrant check. Id. The en banc Fifth Circuit held that the officer's conduct was reasonable under the
Fourth Amendment. Id. at 512.
36. Such checks serve a valid traffic and general law enforcement purpose as they warn the
responding officer of any known dangers about the person stopped and the status of the car. They are
also closely related to the purpose for the initial detention-traffic safety and security. See, e.g., United
States v. Shabazz, 993 F.2d 431, 437 (5th Cir. 1993) ("in a valid traffic stop, an officer can request a
driver's license, insurance papers, vehicle registration, run a computer check thereon, and issue a
citation"); see generally Brigham, 382 F.3d at 507-508 (agreeing with other circuits that have found
"no constitutional impediment to a law enforcement officer's request to examine a driver's license and
vehicle registration or rental papers during a traffic stop and to run a computer check on both"); United
States v. Zabalza, 346 F.3d 1255, 1259 (10th Cir. 2003) ("'[d]uring a routine traffic stop, the
detaining officer may request a driver's license and vehicle registration, run a computer check on the car
and driver, and issue a citation. The detaining officer may also question the vehicle's occupants
regarding their identities, travel plans, and ownership of the vehicle") (citation omitted).
37. 4 LaFave, § 9.2(f), at 51-58 (citations omitted); see generally, Brigham, 382 F.3d at 508.
38. Kothe, 123 S.W.3d at 448.
39. Id. (citing Davis v. State, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997)).
40. Ohio v. Robinette, 519 U.S. 33, 41 (1996) (Ginsburg, J., concurring).
41. United States v. Sharpe, 470 U.S. 675, 685-86 (1985) (declining to "establish a per se
rule that a 20-minute detention is too long" under Terry). The Supreme Court explained: 

 While it is clear that "the brevity of the invasion of the individual's Fourth Amendment
interests is an important factor in determining whether the seizure is so minimally
intrusive as to be justifiable on reasonable suspicion," we have emphasized the need to
consider the law enforcement purposes to be served by the stop as well as the time
reasonably needed to effectuate those purposes. 

Id. at 685 (citation omitted).
42. Brigham, 382 F.3d at 511 ("neither our prior cases nor any other caselaw of which we are
aware institutes a per se rule requiring an officer immediately to obtain the driver's license and
registration information and initiate the relevant background checks before asking questions. ... There is
... no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a
detention extends beyond a reasonable duration is "'whether the police diligently pursued a means of
investigation that was likely to confirm or dispel their suspicions quickly'").
43. See, e.g., United States v. Purcell, 236 F.3d 1274, 1277-78 (11th Cir. 2001) (stating that
fourteen-minute detention was not unreasonable on its face and rejecting argument that officer's
detention became illegal because, after writing a traffic citation, he waited for the results of a computer
check on driver's criminal history; stating that an "officer may also prolong the detention to investigate
the driver's license and the vehicle registration and may do so by requesting a computer check")
(citation omitted); United States v. Wellman,185 F.3d 651, 656 (6th Cir. 1999) (noting that "[t]his
court has ruled that an officer can lawfully detain the driver of a vehicle until after the officer has finished
making record radio checks and issuing a citation, because this activity 'would be well within the
bounds of the initial stop"; traffic stop not unconstitutionally extended by obtaining consent to search
motor home while officer "was waiting for the central office to provide him with information on
defendant's driver's license and vehicle registration"); United States v. Zucco, 71 F.3d 188, 190-91
(5th Cir. 1995) (Terry detention not prolonged merely because officer waited for computer check);
Shabazz, 993 F.2d at 437; compare George E. Dix, Nonarrest Investigatory Detentions in Search
and Seizure Law,
1985 Duke L.J. 849, 895-96 (1985) (suggesting a time limit of 30 minutes for a
Terry stop as a matter of state law because "it is probably unrealistic to expect courts effectively to
review officers' decisions to prolong detention for periods of fifteen to thirty minutes").
44. Kothe, 123 S.W.3d at 448.
45. Although at first glance this may appear to be loosely worded, it is clear that this fuzziness
accurately reflects the fuzziness in the testimony itself. There was a discrepancy in Deputy Forslund's
testimony about the timing that was not clearly resolved. On direct examination, Deputy Forslund
testified that he had obtained Mr. Kothe's driver's license before conducting the field sobriety test. 
However, on cross-examination, Deputy Forslund agreed that he did not take Mr. Kothe's license to
run the computer check until after determining that Mr. Kothe was not intoxicated. 
46. Brigham, 382 F.3d at 511.
47. Id.
48. Even if the detention had been constitutionally unreasonable, that would not necessarily be
the end of the matter. A court would then consider whether Mr. Kothe's consent to the search of his
car was given "by means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371
U.S. at 487-88. That consent issue, however, is not before us.