

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-09-109-CR
NO. 2-09-110-CR

THE STATE OF TEXAS                                                    STATE

V.

EARNEST LYNN ROSS                                                    APPELLEE

------------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

In a single issue, the State seeks reversal of the trial court's order partially granting Earnest Lynn Ross's motion to suppress evidence. Specifically, despite holding evidence found in Ross's vehicle—including evidence found in the vehicle's trunk—admissible, the trial court ordered that evidence located in a

---

[1] *See* Tex. R. App. P. 47.4.

locked suitcase found in the trunk be suppressed. We reverse the portion of the trial court's order suppressing the evidence found in the locked suitcase and remand the case to the trial court.

## II. FACTUAL BACKGROUND

A Denton County Sheriff's deputy arrested Ross on June 16, 2008, during an arranged, preemptive takedown of would-be home invaders at a Wal-Mart parking lot in Denton County, Texas. Through the services of a confidential informant, officers learned that Ross and co-conspirators intended to carry out a series of home invasions. Lieutenant William Scott, with the cooperation of the Dallas Police Department, arranged for the informant to record conversations on three separate occasions between Ross and others concerning their designs to complete these crimes. While the recordings took place, officers conducted surveillance, noting Ross's involvement in the conversations and ascertaining what type of vehicle he drove.

During their investigation of these inchoate crimes, officers learned that Ross had outstanding warrants for his arrest for aggravated robbery and the attempted murder of a Duncanville, Texas, police officer. Officers also learned that Ross had potentially been involved in previous home invasions. According to police, Ross routinely used pliers and lighter fluid as instruments of torture in order to coerce victims "into giving . . . information that was being sought."

2

Through the recordings provided by the informant, officers learned of one upcoming home invasion that would require a truck with a hydraulic lift "because of a very heavy safe that was the target" of the robbery. Scott arranged to meet the informant and provide a truck with a hydraulic lift at the Wal-Mart where the eventual arrest was made. Scott learned that Ross, the informant, and the co-conspirators were to meet at the Wal-Mart, obtain the truck, and then leave to commit the home invasion. The officers' investigation revealed that Ross and his accomplices would have a number of instrumentalities on them designed to aid them in their scheme, including: an SKS assault rifle, handguns, police officers' uniforms to be used as disguises, flex cuffs (large wire ties that are used as temporary handcuffs), lighter fluid, pliers, a tracking device used by Ross to track potential victims, and possibly explosives to be used to open the safe.

At approximately 8:00 p.m. on June 16, 2008, officers executed a vehicle assault on both Ross's vehicle and the informant's vehicle, and placed four individuals under arrest—Ross, his two co-conspirators, and the informant, who was later released. When the officers arrested Ross, he was wearing a bodysuit and a bulletproof vest underneath his shirt and pants, but the bulletproof vest was without its ballistic panels. After arresting Ross and without a warrant, the officers searched Ross's vehicle. Inside the interior of

3

Ross's vehicle, officers found a handgun, a black holster, and a black Yukon night vision bag—a bag consistent with night vision goggles officers believed Ross used during home invasions. Officers then opened the trunk. There the officers found several suitcases, one of which was locked. The officers also found a black bag containing handguns, ammunition, pliers, and other personal effects. Also in the trunk, the officers found other personal effects, rubber gloves, a tracking device, and a black hard case containing tools. Officers then removed Ross's keys from the ignition, and on the key ring they found a key that opened the locked suitcase. Inside the suitcase, officers found two-way radios, batteries, a charger, keys, zip-ties (flex cuffs), two "SWAT" vests, lighter fluid, a black lighter, a handgun and gun belt, a crowbar, ammunition, a listening device, black gloves, another pair of pliers, and a bag containing an SKS assault rifle with a folding stock and magazine of ammunition.

The State brought charges against Ross, including engaging in organized criminal activity and the unlawful possession of a firearm by a felon. Ross filed a motion to suppress all evidence found in his vehicle. The trial court ruled that all the evidence found during the search was lawfully obtained except for the evidence found in the locked suitcase. The State now appeals the trial court's order suppressing the evidence found in the locked suitcase.

4

## III. STANDARD OF REVIEW ON MOTION TO SUPPRESS

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor; and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions

de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 819. When the trial court dictates its findings of fact and conclusions of law into the record, they are treated the same as written findings of fact and conclusions of law. *State v. Bryant*, 161 S.W.3d 758, 761 (Tex. App.—Fort Worth 2005, no pet.).

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

## IV. AUTOMOBILE EXCEPTION TO WARRANT REQUIREMENT

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador*, 221 S.W.3d at 672. A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Id.* Once the defendant has made this showing, the burden of proof shifts to the State, which is then required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable. *Id.* at 672–73; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

Whether a search is reasonable is a question of law that we review de novo. *Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004). Reasonableness is measured by examining the totality of the circumstances. *Id.* at 63. It requires a balancing of the public interest and the individual's right to be free from arbitrary detentions and intrusions. *Id.* A search conducted without a warrant is per se unreasonable unless it falls within one of the "specifically defined and well-established" exceptions to the warrant

7

requirement. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App.), *cert. denied*, 540 U.S. 1004 (2003); *see Best*, 118 S.W.3d at 862.

One such exception holds that the police may lawfully search an automobile if they have probable cause to believe that the vehicle contains evidence of a crime. *Neal v. State*, 256 S.W.3d 264, 282 (Tex. Crim. App. 2008) (citing *Wiede*, 214 S.W.3d at 24). Probable cause to search exists when there is a "fair probability" of finding inculpatory evidence at the location being searched. *Wiede*, 214 S.W.3d at 24 n.29 (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983)). Probable cause also exists when officers have reasonably trustworthy information sufficient to warrant a reasonable belief that an offense has been or is being committed. *McGee*, 105 S.W.3d 609 at 614. In determining whether there was sufficient probable cause, this court must consider the sum of the information known to the officers at the time of a search. *Fineron v. State*, 201 S.W.3d 361, 366–67 (Tex. App.—El Paso 2006, no pet.).

When this so-called "automobile exception" applies, then the police may search "every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S. Ct. 2157, 2173 (1982). This permits officers to search every part of the vehicle and its contents that may conceal the object of the search that forms the basis of

8

probable cause, including any containers or packages found inside the car, without qualification as to ownership. *California v. Acevedo*, 500 U.S. 565, 571, 111 S. Ct. 1982, 1986 (1991); *Wyoming v. Houghton*, 526 U.S. 295, 299, 119 S. Ct. 1297, 1300 (1999).

The scope of a warrantless search of an automobile is not defined by the nature of the container in which the contraband is secreted. *Acevedo*, 500 U.S. at 579, 111 S. Ct. at 1991. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found. *Id.* at 579–80, 111 S. Ct. at 1991. Under this exception, officers may conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant particularly describing the place to be searched. *Id*. at 570, 111 S. Ct. at 1986. For example, probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search of the entire cab. *Id*. at 571, 111 S. Ct. at 1987. But it does justify a search of the container. *Id*. at 574, 111 S. Ct. at 1988 (citing *Ross* at 821, 102 S. Ct. at 2171 n.28).

In addition to the ready mobility of an automobile, the automobile exception is justified because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.

*Keehn v. State*, 279 S.W.3d 330, 335 (2009) (citing *California v. Carney*, 471 U.S. 386, 393, 105 S. Ct. 2066, 2081 (1985)).

For example, in *Keehn*, while investigating a theft and without a warrant, police seized a tank from a minivan parked in Keehn's driveway. *Keehn*, 279 S.W.3d at 331. Days before the seizure, the victim of the theft reported seeing a male and female run to the back of a nearby house. *Id.* at 332. A few minutes later, a minivan left the house. *Id.* The victim tried to stop the van but was unsuccessful. A police officer went to the nearby house several times looking for the van, but it was not there. *Id.* Days later, the officer spotted the van parked in the house's driveway and decided to talk to the residents about the theft. As he walked up the driveway to the front door, the officer looked into the van's passenger-side windows. The officer saw a five-gallon propane tank in the back of the van and noticed that the "cutting of the tank" had a bluish-greenish discoloration. *Id.* Based on his experience, the officer concluded that the tank contained anhydrous ammonia, which is used to manufacture methamphetamine. *Id.* He proceeded to the house and knocked on the door. He heard "a bunch of rustling around . . . inside of the residence." After knocking for "some time," he returned to his vehicle and called for assistance. *Id.* And, because of the propane tank, he requested the additional assistance of drug task force officers. *Id.*

10

After assistance arrived, the officer went back to the house and knocked again. *Id.* Keehn answered, and the officer told him that he was investigating the theft. Multiple officers entered the house and questioned Keehn about the theft. *Id.* After speaking with Keehn, one of the task force officers, who had been trained regarding the investigation and production of methamphetamine, went to the van and looked in the windows. *Id.* The task force officer saw the propane tank in the van and noticed that the valve was discolored and looked like it had been modified in some way. Based on his training and experience, the task force officer also believed that the tank contained anhydrous ammonia. *Id.* The task force officer entered the van, seized the tank, and tested the tank for ammonia. The test yielded a positive result, and the officer arrested Keehn. Keehn did not give the officers permission to enter the van to seize the tank. *Id.*

The court of criminal appeals held that the automobile exception gave the officers the right to enter the van and seize the propane tank because the van was readily mobile, subject to " pervasive [government] regulation," and based on their training and investigative experience concerning the production of methamphetamine, the officers had probable cause to believe that the tank contained anhydrous ammonia. *Id.* at 335 (citing *Carney*, 471 U.S. at 391–92, 105 S. Ct. at 2066).

11

## V. The Officers were Justified in Searching the Locked Suitcase

The record from the motion to suppress hearing indicates that the officers in this case had reasonably trustworthy information that led them to believe that Ross's vehicle contained evidence of the crime he was about to commit. Lieutenant Scott testified that on three occasions the confidential informant recorded conversations with Ross and other co-conspirators about the planned home invasion. Prior to the arrest, Scott and the informant met at the Wal-Mart—a location where the officers had information, from the informant and recordings, that led them to believe would be a meeting point en route to the home invasion involving the safe. Officers had supplied the informant with a hydraulic-lift truck to be picked up at the Wal-Mart. Officers knew that Ross and his co-conspirators planned to use the truck to retrieve a safe during the planned home invasion. The officers verified Ross's vehicle, having observed Ross drive it multiple times during their investigation. The officers then observed Ross arrive in his vehicle to pick up the truck, as well as other known co-conspirators, at the Wal-Mart at the time the informant and recordings had revealed. In fact, the trial court specifically found that the confidential informant was reliable, that the officers knew with particularity the place where Ross and his co-conspirators would meet, and that the officers knew of the planned home invasion.

12

In addition, the officers had information that instrumentalities of the home invasion would be found on or near Ross. The trial court specifically found that the officers correctly believed that "guns [and] possibly explosives" would be found during the arrest. The officers clearly expected to find an SKS assault rifle. Officers had also testified that they expected to find lighter fluid, which was known to be used by Ross during home invasions to torture victims into giving information. The officers were also looking for pliers, another of Ross's known torturing instruments. In addition, officers knew that Ross and his co-conspirators intended to disguise themselves as police officers during the home invasion; thus, the officers expected to find any number of items—police vests, police shirts, or sheriff's gear. Given the totality of the circumstances, the trial court found that the officers had probable cause to search Ross's vehicle, including the trunk.

But the trial court specifically held that the officers illegally searched the locked suitcase found in Ross's trunk. Apparently, the trial court believed that if the officers "really believed that there might be a bomb [in the locked suitcase], then prudence would dictate that" they call the "bomb squad." But prudence is not the standard for the exception applicable to an automobile

13

search of this type.  The standard is probable cause.[2]  The officers had probable

cause to believe that any of the evidence described at the motion to suppress

hearing, verified by the informant and the audio recordings, could have been

found in the locked suitcase; thus, under the automobile exception, the officers

were justified in conducting a warrantless search of Ross's vehicle—including

the locked suitcase.  *See Blaylock v. State*, 125 S.W.3d 702, 704–05 (Tex.

App.—Texarkana 2003, pet. ref'd) (holding that officers had probable cause to

detain defendant and search his vehicle under automobile exception to warrant

requirement when informant arranged meeting with defendant for the sale of

cocaine, informant accurately described defendant's vehicle, and informant

accurately predicted location and time of arranged meeting); *see also Neal*, 256

S.W.3d at 282 (holding that when the automobile exception applies, officers

may search "every part of the vehicle and its contents that may conceal the

---

[2] Both the State and Ross spent a portion of their briefs explaining whether exigent circumstances existed to justify the officers' search of Ross's vehicle.  But, in accordance with the United States Supreme Court's jurisprudence concerning the automobile exception, the court of criminal appeals has held that exigency is not a requirement to the automobile exception.  *See State v. Guzman*, 959 S.W.2d 631, 633–34 (Tex. Crim. App. 1998) ("[A] vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and *there is no requirement of exigent circumstances to justify such a warrantless search*.") (quoting *United States v. Johns*, 469 U.S. 478, 484, 105 S. Ct. 881, 885 (1985)).  In the instant case, the police had reliable information leading them to believe that explosives would be found in the vehicle.

14

object of the search."). Given that Ross's vehicle is subject to regulation, is readily mobile, and the officers had probable cause to believe that it contained evidence of a crime, we hold that the trial court erred by suppressing evidence found in the locked suitcase and sustain the State's sole issue. *See Keehn*, 279 S.W.3d at 335.

## VI. CONCLUSION

Having sustained the State's sole issue, we reverse the trial court's order suppressing the evidence found in the locked suitcase and remand the case to the trial court for further proceedings. *See* Tex. R. App. P. 43.2(d).

PER CURIAM

PANEL: MEIER, LIVINGSTON, and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: January 7, 2010

15