

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-14-00065-CR

---

BRANDON RAY ANTWINE, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 196th District Court
Hunt County, Texas
Trial Court No. 26,282

---

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

Brandon Ray Antwine was convicted of possession with intent to deliver more than 400 grams of cocaine. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(f) (West 2010). On appeal, he challenges the trial court's denial of his motion to suppress. Antwine alleges that the detention was unduly prolonged, that he never consented to the search that led to the discovery of the cocaine following a routine traffic stop, and that the testimony of a State's witness offered at the suppression hearing was incredible. We find no abuse of discretion by the trial court and affirm the judgment and conviction.

I.      Facts

Deputy William Dykes was monitoring traffic on eastbound Interstate 30 shortly after midnight June 9, 2009, when he saw a car driven by Antwine pass by without proper illumination for the rear license plate. *See* TEX. TRANSP. CODE ANN. § 547.322(f) (West 2011). Dykes stated that, after he pulled Antwine over, he walked to the driver's side window and talked to Antwine. According to Dykes, Antwine was very nervous and did not have a driver's license; he did, however, tell Dykes his name and date of birth. Dykes returned to his car and called the dispatcher to check whether Antwine had a driver's license and to check for warrants. He also called for assistance or backup, and Deputy Beau Radney responded within a few minutes. While speaking to Antwine, Radney smelled marihuana. Radney asked Antwine about the marihuana odor, and Antwine admitted having smoked a marihuana cigarette in the car

earlier. He told Radney that there "might be a roach in the ashtray." These statements led to a search of Antwine's car[1] and the discovery of 985 grams of cocaine.

## II.  Standard of Review

We review a trial court's ruling on a motion to suppress for an abuse of discretion and overturn that ruling "only if it is outside the zone of reasonable disagreement." *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011). We apply two different standards in reviewing such rulings, "giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely on the credibility of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations." *Id*. at 922–23. In a determination that presents a mixed question of law and fact, appellate courts afford almost total deference to questions of historical fact that turn on credibility and demeanor, but otherwise conduct a de novo review. *Herrera v. State*, 241 S.W.3d 520, 526–27 (Tex. Crim. App. 2007).

## III.  Detention

At the heart of his motion to suppress was Antwine's contention that Dykes had no reason to detain him after Dykes decided to issue a warning citation for the faulty tag light. Antwine averred that, once Dykes made that decision, the reason for the traffic stop had been resolved, and further detention was illegal. He claimed that Dykes' call to Radney for backup was based only on Dykes' perception of Antwine as very nervous and argues that this reason was

---

[1]*See Moulden v. State*, 576 S.W.2d 817, 820 (Tex. Crim. App. 1978) (smell of burnt marihuana in vehicle gave officers probable cause to search); *see also Parker v. State*, 206 S.W.3d 593, 597 n. 11 (Tex. Crim. App. 2006).

insufficient to warrant further detention. Antwine's motion to suppress was first argued at a pretrial hearing and then reurged and argued through trial testimony.[2]

"[T]he general rule is that an investigative stop can last no longer than necessary to effect the purpose of the stop." *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004). Once the original purpose for the stop is completed, police may not *unnecessarily* detain drivers solely in the hope of finding evidence of some other crime. *Id.* at 64. An officer may request identification, proof of insurance, and vehicle registration; check outstanding warrants; and ask about the purpose of the trip. *Siffert v. State*, 290 S.W.3d 478, 483 (Tex. App.—Amarillo 2009, no pet.). The law does not impose a rigid timeline on a traffic stop, but a traffic stop is temporary and may not last longer than necessary to effectuate its purpose. *Kothe*, 152 S.W.3d at 63–64.

Antwine focuses on Dyke's statement that he called for a backup officer because Antwine was acting nervous. During the suppression hearing, Antwine asked Dykes, "So the sole reason you called Mr. -- Deputy Radney to the scene was because Mr. Antwine was acting nervous and fidgety?" Dykes responded, "Right. He kept patting at his pants and kept sticking his hands in his pockets."

However, later Dykes expanded on his reasons for calling another officer to the scene. He stated, "[Antwine] was clenching his pockets and patting his legs. I didn't know what -- if he had anything on him at that time and I was the only officer out there. It was midnight. So I

---

[2]The trial testimony of Dykes and Radney mostly mirrored their testimony at the suppression hearing; Radney did not watch the video recording from Dyke's patrol car before the 2010 hearing, but had viewed it before testifying at trial. The suppression hearing was held June 21, 2010, and trial occurred in March 2014.

4

called for backup. Later, under cross-examination, Antwine again asked Dykes his purpose for calling a backup officer. Dykes answered, "Be there just as a witness in case someone -- backs you up in case something goes bad."

In Antwine's reading of the record, Dykes had decided to issue a warning citation to Antwine; therefore the purpose of the traffic stop had been effectuated and Radney should never have been called to the scene. Had Radney never been there, the marihuana odor would not have been noticed, the car would not have been searched, and the cocaine never would have been found. However, we find the record does not conclusively support this interpretation.

A brief summary of the events as recorded by the video camera is helpful. The times shown are the elapsed time of the videotape.

| | |
|---|---|
| 2:30 | Dykes makes contact at driver's side window |
| 3:32 | Dykes asks for driver's license |
| 5:02–5:24 | Dykes contacts dispatcher with Antwine's identification information |
| 5:47 | Dykes contacts Radney by radio and asks him to come to the location of the stop; driver is "pretty nervous" |
| 7:02–7:57 | Dispatcher reports information obtained using Antwine's identification information |
| 10:13 | Radney apparently arrives; radio broadcasts, "443 county show me out with 449"; Radney later testified that 443 is his badge number and 449 is Dykes' badge number |
| 10:50 | Radney and Dykes discuss traffic stop |
| 11:15 | Radney approaches passenger window of Antwine's car |

5

13:40    Radney states, "The reason I'm asking about the marihuana is I went to your window and I smell it and I can still smell it now." Antwine acknowledges smoking marihuana earlier in the car

15:32    Radney apparently finds cocaine and places Antwine under arrest

As shown by the recording, the entire encounter lasted just over fifteen minutes. Radney arrived on the scene within ten minutes of the original stop.

## IV.    No Abuse of Discretion

Dykes had reasonable suspicion to conduct a traffic stop of Antwine upon the deputy's observation of the car's inadequate license plate illumination. A check of license status and for any warrants is an "additional component" of a "routine traffic stop." *Kothe*, 152 S.W.3d at 63. Antwine focuses on Dykes' statement that he had decided to issue a warning citation to Antwine and that, "at that point in time [Dykes] had absolutely no reason whatsoever to detain [Antwine] any further . . . ." However, Dykes explained, "I was in my vehicle writing the citation -- or the warning citation out at the time [Radney] showed up." Radney testified that when he arrived at the scene, Dykes was "running [Antwine's information] through TCIC, NCIC and carried on with the warning citation, I engaged Mr. Antwine in general conversation through the window. I did ask him to step out of the vehicle for mine and his safety both, to get us away from the vehicles." At some point Radney smelled marihuana and asked Anwine about this smell. According to Radney, Antwine stated that he had smoked marihuana earlier in the car. Based on Radney's version of the events, when asked if there was more marihuana in the vehicle, Antwine gave Radney permission to search the car. Once Radney spoke to Antwine and detected evidence of marihuana, the reasonable suspicion incident to Dykes' traffic stop evolved into

6

probable cause to believe a marihuana offense had been committed. There was no unreasonable extension of the detention; the deputies were conducting a permissible investigation incident to a traffic stop after having witnessed a violation of the Texas Transportation Code.[3]

Finally, Antwine complains that Radney's testimony was incredible. Radney testified at the suppression hearing, held in June 2010, that, upon arriving at scene, Radney immediately asked Antwine to get out of the car to talk. Radney testified that this is his normal practice and that he does this for safety. When he met Antwine between Antwine's and Dykes' cars, Radney stated that, "a breeze blew off of him that hit me[,] and I did smell marijuana." During the suppression hearing, Radney testified that he did not smell marihuana in the vehicle itself. Three years later, at trial, Radney said he did smell marihuana when he first spoke to Antwine through the passenger window. He also said that the smell of marihuana was coming from Antwine's person when he was out of the vehicle when a breeze blew the smell toward Radney. Radney explained this discrepancy by testifying that he had not watched the video recording of the stop before the 2010 suppression hearing but had viewed it before his trial testimony in 2014.

"At a hearing on [a] motion, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Ex parte Moore*, 395 S.W.3d 152, 158

---

[3]We distinguish *Pfeiffer v. State*, No. 06-11-00001-CR, 2011 Tex. App. LEXIS 3354, at *7–8 (Tex. App.—Texarkana May 4, 201l) (mem. op., not designated for publication), *rev'd on other grounds*, 363 S.W.3d 594 (Tex. Crim. App. 2012), cited by Antwine. In *Pfeiffer*, we found no reasonable suspicion to extend a detention after a traffic stop for no mud flaps. *Id.* at *1. In that case, the officer twice told the driver he would issue a warning, the driver had no outstanding warrants, the driver twice refused the officer's request to search the vehicle, the officer then summoned a canine and detained the driver until the animal arrived. *Id.* Here, the second officer arrived while the first officer was completing the paperwork for the warning citation; during that time, the second officer noticed the distinct smell of marihuana, and almost right after that Antwine told the second officer of his recent drug use.

(Tex. Crim. App. 2013).  Here, the trial court was able to observe Radney's demeanor during his testimony.  We find no abuse of discretion in the trial court's denial of the suppression motion.

We affirm the trial court's judgment.


Jack Carter
Justice

Date Submitted:    August 25, 2014
Date Decided:     September 17, 2014

Do Not Publish

8