Becker v. State



COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS





CHRISTOPHER DAVID RYAN,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee. 

§


 


§


 


§


 


§


 


§



§

No. 08-06-00016-CR



Appeal from


 112th District Court


of Upton County, Texas


(TC # 05-05-U790-DPO)




O P I N I O N



 Christopher David Ryan appeals his conviction of possession of more than 200 grams but
less than 400 grams of methamphetamine. The indictment alleged that Appellant committed
possession of methamphetamine with intent to deliver (Count 1) and possession of
methamphetamine (Count 2). The jury found Appellant not guilty of Count 1, but found him guilty
of Count 2, and assessed his punishment at imprisonment for sixty-five years. We affirm.

FACTUAL SUMMARY


 On the afternoon of March 2, 2005, State Trooper Zane Greenwood, who is stationed in
Rankin, observed an 18-wheeler turn onto Highway 349 toward Midland rather than taking the route
designated for trucks. Because this was a traffic violation, Greenwood pulled the truck over about
half a mile outside of Rankin. Appellant was driving. He is an Illinois resident and told Greenwood
that because he was not familiar with the area, he had gotten lost. He had dropped a load in
Eagle Pass the previous evening and was on his way to Midland, and then on to Seminole. 
Greenwood asked for his driver's license and log book. The trooper then requested a license and
criminal history check. While awaiting those results, Greenwood examined Appellant's log. A
commercial truck driver is required to keep a log showing his duty status, where he stopped and for
how long, and the hours of service or how many hours he has been driving. Greenwood noticed that
there were no entries for that day. Rather than giving Appellant a ticket for the traffic violation,
Greenwood began writing a warning ticket and gave Appellant an opportunity to make his log
entries. 

 While Appellant filled out his log, he told Greenwood that he had been stopped earlier by the
Border Patrol because they did not often see 18-wheelers south of Rankin. He also volunteered that
he had previously been in trouble with the law because he had resisted arrest following a domestic
dispute. During this encounter, Greenwood saw that Appellant was extremely nervous to the point
that he was shaking. Given the degree of nervousness, Appellant's direction of travel from a "drug
source area," and the absence of entries in his log book, Greenwood suspected that Appellant might
be transporting narcotics. He asked Upton County Deputy Sheriff Mike Detrixhe and his dog, Jack,
to come to the scene. Greenwood then conducted a pat-down search for his own safety and removed
two knives from Appellant's person. Greenwood also felt another hard object in one of Appellant's
pockets. Concerned that it might be a weapon, Greenwood removed the item which turned out to
be a long, wooden box. Appellant told him that the box contained marihuana. 

 In Appellant's vest pocket, Greenwood found a baggie with a white powdery residue around
it and a "foily" which is used to smoke speed. Appellant explained that he had picked them up off
of the ground at a truck stop because it "looked illegal" but did not know what it was. Greenwood
didn't have a field test kit with him so he was unable to test the residue. The trooper also removed
two sets of keys from Appellant's pockets. Greenwood asked Appellant if he had anything illegal
in the truck and Appellant replied that he did not. He told Greenwood to "check" the truck. 
Greenwood asked if he was consenting to a search of the truck and its contents, and Appellant told
him to "go right ahead." The canine unit had arrived a few minutes before Appellant gave his
consent for the search.

 Deputy Detrixhe conducted a canine search of the vehicle. Jack alerted to a locked tool box
outside the truck behind the cab. It was locked with a high security lock used by the military to
secure the arms room. Jack also alerted to the interior of the cab, where Detrixhe found partially
smoked marihuana cigarettes on the driver's side floorboard and a box containing marihuana
between the front and passenger seats. 

 At that point, Greenwood formally placed Appellant under arrest and handcuffed him. He
and Greenwood ultimately retrieved four boxes of pseudoephedrine, a hypodermic needle, and a
plastic film canister which contained two baggies of a white powdery substance. A field test of the
white powdery substance in the baggies showed that it was methamphetamine. Greenwood opened
a tool box area and found a Walmart bag which contained salt, a funnel, coffee filters, and a red
plastic bottle sealed inside of a plastic Ziploc bag. Greenwood knew from his experience and
training that these items are used to manufacture methamphetamine.

 The officers moved the vehicle to a more secure location and continued searching with the
assistance of DPS Narcotics. Greenwood opened the tool box with a key found on one of the
keychains in Appellant's pocket. Inside the tool box he found a backpack containing a gallon jar
with a liquid substance. The backpack also contained a piece of tubing with a lid on it which is used
in the manufacturing of methamphetamine. A field test of the liquid substance in the jar showed that
it contained methamphetamine. 

 Greenwood then telephoned Jason Little, a police officer with the Crane Police Department,
and asked for assistance because of his prior experience as a narcotics investigator for the DPS Task
Force. Little is familiar with the methamphetamine manufacturing. He examined the items found
in Appellant's vehicle, including the gallon jar. He explained to the jury the process for
manufacturing methamphetamine and said that only one step remained for the liquid substance in
the gallon jar to be transformed into methamphetamine powder. Little also noticed that Appellant
had numerous sores and scratch marks on his skin that are indicative of methamphetamine use. 
Dennis Hambrick, a chemist with the Texas Department of Public Safety in Midland, tested the
substance in the gallon jar and determined that it contained methamphetamine. The total weight of
the liquid substance was 387.75 grams. Another DPS chemist, Bob Wheeler, tested the white
powdery substance in the baggies found inside of the film canister and determined that it also was
methamphetamine. 

 Appellant testified in his own defense. He had worked for Justin's Trucking for about three
weeks before this incident. The owner of the company and another driver, "Rick," sometimes drove
the truck. Before Appellant left on this trip, Rick had removed some items from the truck but
Appellant did not watch him to see what he took out or what he put in. Appellant believed that Rick
had put the padlock on the toolbox and Appellant didn't think he had a key. Appellant drove from
Goreville, Illinois to Dallas where he made a drop, and then to Houston and Eagle Pass where he
made drops. While traveling from Eagle Pass to Midland, he got lost and ended up in Uvalde. From
Uvalde, he went through Iraan and into Rankin. The DPS trooper pulled him over in Rankin. They
initially talked outside of the truck but Greenwood sent him back for his log book. Appellant also
retrieved a map and put on another driver's vest that was inside the truck. Greenwood patted him
down when he returned with the log book. Appellant denied telling Greenwood that there was
marihuana in the box and claimed Greenwood did not look inside. While Greenwood was running
a check on his driver's license, Appellant filled out his log book. When Greenwood asked him, "Do
you care if I search your vehicle?" Appellant replied that he did because it was not his vehicle. He
told Greenwood to check with the owner. At another point in his testimony, Appellant said that he
gave Greenwood permission to search but he did not consent to a canine search. He also testified
that he gave Greenwood permission to search if the truck's owner consented. Appellant had
purchased the wooden Harley Davidson box with the marihuana inside of it from a person he had
met in Eagle Pass. He didn't buy it for the drugs but because it was a Harley Davidson box. He
knew it had marihuana in it when he bought it. He did not own the vest which he put on after
Greenwood stopped him. Appellant used the hypodermic the officers found in the truck to pop the
"zits" on his back. Appellant admitted using methamphetamine once but he denied making any
methamphetamine or knowing anyone who did.

 In rebuttal, the State offered the testimony of Michael Ryan, an investigator with the Jackson
County Sheriff's Office in Illinois. Ryan had known Appellant for several years and had spoken with
him two weeks before trial. Appellant provided Ryan with the names of several people who
manufactured methamphetamine, including Keith Kimmel and "Rick." He also told Ryan that he
knew several users, including a former girlfriend, Kelly Rainy. Ryan was already familiar with these
individuals and knew through his own investigation that they were methamphetamine manufacturers
and/or users. Appellant admitted to Ryan that he had used methamphetamine with Rainy and Ronnie
Bond, and that he had been at a place where a "foily" was passed around. He told Ryan that he
believed someone named Rick had put the methamphetamine in the truck. Additionally, Appellant
said that if Ryan promised not to prosecute him and would provide him with the "pills," he would
get together with Bond and "have a cook" later that evening. 

 Appellant returned to the witness stand to rebut Ryan's testimony. He told the jury that he
had obtained the names of the meth users and meth cooks through his own investigation, not through
personal knowledge. He did not believe he had lied to the jury by stating that he did not know
anyone who used or manufactured methamphetamine. 

FACTUAL SUFFICIENCY


 In Point of Error One, Appellant challenges the factual sufficiency of the evidence supporting
his conviction. In reviewing the factual sufficiency of the evidence to support a conviction, we are
to view all the evidence in a neutral light, favoring neither party. Johnson v. State, 23 S.W.3d 1, 7
(Tex.Crim.App. 2000); Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). In performing
our review, we are to give due deference to the fact finder's determinations. See id. at 8-9; Clewis,
922 S.W.2d at 136. The fact finder is the judge of the credibility of the witnesses and may "believe
all, some, or none of the testimony." Chambers v. State, 805 S.W.2d 459, 461 (Tex.Crim.App.
1991). Evidence is factually insufficient if it is so weak that it would be clearly wrong and
manifestly unjust to allow the verdict to stand, or the finding of guilt is against the great weight and
preponderance of the available evidence. Johnson, 23 S.W.3d at 11. Therefore, the question we
must consider in conducting a factual sufficiency review is whether a neutral review of all the
evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak
as to undermine confidence in the fact finder's determination, or the proof of guilt, although
adequate if taken alone, is greatly outweighed by contrary proof. See id. Under the first prong of
Johnson, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply
because, on the quantum of evidence admitted, we would have voted to acquit had we been on the
jury. Watson v. State, 204 S.W.3d 404, 417 (Tex.Crim.App. 2006). Under the second prong of
Johnson, we cannot declare that a conflict in the evidence justifies a new trial simply because we
disagree with the jury's resolution of that conflict. Id. Before finding that evidence is factually
insufficient to support a verdict under the second prong of Johnson, we must be able to say, with
some objective basis in the record, that the great weight and preponderance of the evidence
contradicts the jury's verdict. Id.

 A person commits an offense if he knowingly or intentionally possesses methamphetamine. 
See Tex.Health & Safety Code Ann. §§ 481.102(6), 481.115(a)(Vernon 2003 and Vernon Supp.
2006). The offense is a first-degree felony if the amount possessed is more than 200 grams but less
than 400 grams. Tex.Health & Safety Code Ann. § 481.115(e). Possession is defined as "actual
care, custody, control, or management." Tex.Health & Safety Code Ann. § 481.002(38). In
order to support a conviction for unlawful possession of a controlled substance, the State must prove
through either direct or circumstantial evidence that the accused (1) exercised actual care, custody,
control, and management over the contraband, and (2) the accused knew the substance he possessed
was contraband. See Poindexter v. State, 153 S.W.3d 402, 405-06 (Tex.Crim.App. 2005); Menchaca
v. State, 901 S.W.2d 640, 651 (Tex.App.--El Paso 1995, pet. ref'd). A person acts knowingly, or
with knowledge, with respect to the nature of his conduct or to circumstances surrounding his
conduct when he is aware of the nature of his conduct or that the circumstances exist. 
Tex.Pen.Code Ann. § 6.03(b)(Vernon 2003).

 When the accused is not in exclusive possession of the place where the substance is found,
there must be additional independent facts and circumstances which affirmatively link the accused
to the contraband, in order to conclude that the accused had knowledge of and control over the
contraband. Poindexter, 153 S.W.3d at 406. An affirmative link generates a reasonable inference
that the accused knew of the contraband's existence and exercised control over it. See Brown v.
State, 911 S.W.2d 744, 747 (Tex.Crim.App. 1995). The "affirmative links" rule is designed to
protect the innocent bystander from conviction based solely upon the fortuitous proximity to
someone else's drugs. Id. By either direct or circumstantial evidence, the State "must establish, to
the requisite level of confidence, that the accused's connection with the drug was more than just
fortuitous." Levario v. State, 964 S.W.2d 290, 294 (Tex.App.--El Paso 1997, no pet.), citing Brown
v. State, 911 S.W.2d 744, 747 (Tex.Crim.App. 1995).

 Courts have looked to various factors in determining the existence of an affirmative link,
including: (1) the defendant's presence at the location where a search warrant was executed; (2)
whether the contraband was in plain view; (3) the defendant's proximity to and accessibility of the
contraband; (4) whether the defendant was under the influence of narcotics when arrested; (5)
whether the defendant possessed other contraband when arrested; (6) whether the defendant made
incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the
defendant made furtive gestures; (9) whether there was an odor of the contraband; (10) whether other
contraband or drug paraphernalia was present; (11) whether the defendant owned or had the right
to possess the place where the drugs were found; (12) whether the contraband was found in an
enclosed place; (13) whether the accused was the operator of an automobile where contraband was
found; (14) whether the defendant was found with a large amount of cash or weapons at the time of
his arrest; (15) whether the conduct of the accused indicated a consciousness of guilt; and (16)
whether there was a significant amount of contraband. See Gregory v. State, 159 S.W.3d 254, 260
(Tex.App.--Beaumont 2005, pet. ref'd); Nguyen v. State, 54 S.W.3d 49, 53 (Tex.App.--Texarkana
2001, pet. ref'd); Hurtado v. State, 881 S.W.2d 738, 743 n. 1 (Tex.App.--Houston [1st Dist.] 1994,
pet. ref'd). The number of factors present is not as important as the logical force the factors have
in establishing the elements of the offense. Corpus v. State, 30 S.W.3d 35, 38 (Tex.App.--Houston
[14th Dist.] 2000, pet. ref'd); Whitworth v. State, 808 S.W.2d 566, 569 (Tex.App.--Austin 1991, pet.
ref'd).

 While Appellant denied being a methamphetamine user or knowing anyone who used or
manufactured it, the State impeached his testimony. Appellant also offered evidence that other
drivers used the truck, that he did not know the methamphetamine was in the truck, and that he was
unaware he had a key to the locked tool box where the methamphetamine was found. It was the
jury's task to weigh the evidence, resolve the conflicts in the testimony, and to choose between
Appellant's theory that one of the other drivers left the methamphetamine in the truck and the State's
theory that Appellant possessed the methamphetamine. The evidence is not factually insufficient
simply because Appellant offered an alternative explanation for how the methamphetamine came
to be found in the truck. Our review of the evidence shows the presence of several factors which
affirmatively link Appellant to the methamphetamine: (1) Appellant was the operator of the truck
and he had in his pocket the key to the lock which secured the tool box where the jar of
methamphetamine was found; (2) there were marks and sores on Appellant's body indicative of
methamphetamine use; (3) Appellant admitted to Investigator Michael Ryan that he had used
methamphetamine on more than one occasion and he offered to "have a cook" with a known meth
cook, Ronnie Bond; (4) several ingredients commonly used in the manufacture of methamphetamine
were found in the truck; and (5) a "foily," which is used to smoke methamphetamine, was found in
the pocket of a vest Appellant was wearing when arrested. Based on our review of all the evidence,
we are unable to conclude that the great weight and preponderance of the evidence contradicts the
jury's verdict. Because the evidence is factually sufficient to establish beyond a reasonable doubt
that Appellant knew of the methamphetamine's existence and he exercised control over it, we
overrule Point of Error One.

MOTION TO SUPPRESS


 In two related points of error, Appellant challenges the admission of the evidence seized
during the traffic stop and subsequent search of the truck. He contends in Point of Error Two that
his detention was unreasonable under the Fourth Amendment because it exceeded the amount of
time necessary to write him a warning ticket for the traffic violation. In Point of Error Three, he
argues that his consent was involuntary. 

Standard of Review


 We review a trial court's ruling on a motion to suppress using the bifurcated standard of
review articulated in Guzman v. State, 955 S.W.2d 85 (Tex.Crim.App. 1997). See Carmouche v.
State, 10 S.W.3d 323, 327 (Tex.Crim.App. 2000); Krug v. State, 86 S.W.3d 764, 765 (Tex.App.--El
Paso 2002, pet. ref'd). At a suppression hearing, the trial judge is the sole trier of fact and judge of
the credibility of the witnesses and the weight to be given to their testimony. State v. Ross, 32
S.W.3d 853, 855 (Tex.Crim.App. 2000). Consequently, we do not engage in our own factual review. 
Id. Almost total deference is given to the trial court's ruling on questions of historical fact and
application of law-to-fact questions that turn on an evaluation of credibility and demeanor. Montanez
v. State, 195 S.W.3d 101, 107 (Tex.Crim.App. 2006), citing Guzman, 955 S.W.2d at 89. A trial
court's rulings on mixed questions of law and fact that do not turn on the credibility and demeanor
of witnesses are reviewed de novo. Id. Furthermore, when a trial court fails to file findings of fact,
such as in this case, we view the evidence in the light most favorable to the trial court's ruling. Ross,
32 S.W.3d at 855.

Unreasonable Detention


 A law enforcement officer may lawfully stop a motorist who commits a traffic violation in
the officer's presence. See Garcia v. State, 827 S.W.2d 937, 944 (Tex.Crim.App. 1992). The
decision to stop an automobile is reasonable when an officer has probable cause to believe that a
traffic violation has occurred. Walter v. State, 28 S.W.3d 538, 542 (Tex.Crim.App. 2000). There
are two inquiries when determining the reasonableness of an investigative detention: (1) whether
the officer's action was justified at its inception; and (2) whether it was reasonably related in scope
to the circumstances that justified the interference in the first place. See Terry v. Ohio, 392 U.S. 1,
18-19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). A stop that was justified at its inception may
become unreasonable if it does not satisfy the second part of the inquiry and last no longer than
necessary to effectuate the purposes of the stop. Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 
1319, 1325, 75 L.Ed.2d 229 (1983); Davis v. State, 947 S.W.2d 240, 245 (Tex.Crim.App. 1997). 
Further, the investigative methods employed should be the least intrusive means reasonably available
to verify or dispel the officer's suspicion in a short period of time. Florida v. Royer, 460 U.S. at 500,
103 S.Ct. at 1325-26; Davis, 947 S.W.2d at 245.

 During a traffic stop, a police officer may request information from a driver, such as a
driver's license and car registration, and may conduct a computer check for that information as well
as a check for warrants. Kothe v. State, 152 S.W.3d 54, 63-64 (Tex.Crim.App. 2004); Davis, 947
S.W.2d at 245 n.6. Generally, a traffic stop is not fully resolved until after the computer check of
the driver's information is complete. Kothe, 152 S.W.3d at 63-64. However, an officer's actions
can become unreasonable if a license check unduly prolongs the detention. Id. at 65. A driver's
consent to search the vehicle, if otherwise voluntary, is effective to legalize the search if it is given
within the scope of a reasonable traffic stop. See Royer, 460 U.S. at 501, 103 S.Ct. at 1326. 

 Since Appellant does not argue that Trooper Greenwood lacked probable cause to believe
that he had committed a traffic violation, we are only concerned with the second part of the Terry
inquiry. Taken in the light most favorable to the trial court's ruling, the evidence shows that
approximately twenty-five minutes passed from the time Greenwood initially stopped Appellant until
he asked for consent to search. While it ordinarily would have taken Trooper Greenwood only a few
minutes to issue a warning ticket for a traffic violation, he also required Appellant to update his log
while Greenwood waited for the driver's license and criminal history checks to be completed. 
During this short period of time, Greenwood developed a reasonable suspicion that Appellant was
transporting drugs due to Appellant's extreme nervousness and shaking, his direction of travel from
a border town known as a a "drug source area," and the absence of entries in his log book. When
the warrants and criminal history check revealed that Appellant had an arrest for drug paraphernalia,
Greenwood's suspicions became further aroused. Given the circumstances and the information
regarding Appellant's prior conviction for assaulting a police officer, Greenwood conducted a pat-down search of Appellant for his own safety and he removed two knives from Appellant's person. 
He also felt a long wooden box in one of Appellant's pockets and removed it because he feared that
it might contain a knife or other object which could harm him. Appellant told Greenwood that the
box contained marihuana and when Greenwood opened it, he found that it did contain marihuana. 
At this point, probable cause existed to arrest Appellant for possession of marihuana. Therefore, the
State was not required to justify the continued detention of Appellant under Terry's reasonable
suspicion standard.

 Although Appellant was detained on the roadside for a little more than twenty minutes from
the time of the initial traffic stop until Deputy Detrixhe and Jack arrived, Appellant was detained
only a matter of a few minutes before Greenwood developed reasonable suspicion to believe
Appellant was involved in criminal activity. The detention up to that point was reasonable under
the Fourth Amendment because Greenwood was waiting for Appellant to complete his log book and
for the driver's license and warrant checks to be completed. See Kothe, 152 S.W.3d at 63-64. It was
only a few minutes more before the pat-down search took place and the marihuana was discovered. 
The detention during that period of time was reasonable because Greenwood had developed a
reasonable suspicion that Appellant was involved in criminal activity. There is no evidence that the
driver's license and warrants checks unduly prolonged the detention and the record reflects that
Greenwood diligently pursued the investigation. The trial court did not abuse its discretion in
impliedly determining that the detention was reasonable in scope under the Fourth Amendment. 
Since neither the initial stop nor its duration violated the Fourth Amendment, Appellant's consent
to search the vehicle was not tainted. See Kothe, 152 S.W.3d at 66-67. Point of Error Two is
overruled.

Voluntariness of Appellant's Consent


 Pointing to conflicting evidence on the subject of consent, Appellant argues in Point of Error
Three that the State failed to prove that his consent to search was voluntary. Under the Fourth and
Fourteenth Amendments to the United States Constitution, a search conducted without a warrant
issued with probable cause is per se unreasonable. Schneckloth v. Bustamonte, 412 U.S. 218, 219,
93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Consent to search is one of the well-established
exceptions to the constitutional requirements of both a warrant and probable cause. Id. at 219, 93
S.Ct. at 2043-44, 36 L.Ed.2d 854; Carmouche, 10 S.W.3d at 331. The test for a valid consent to
search requires the consent to be voluntary, and voluntariness is a question of fact to be determined
from all the circumstances. Schneckloth, 412 U.S. at 248-49, 93 S.Ct. at 2059; Carmouche, 10
S.W.3d at 331. To be valid, consent to search must be positive and unequivocal and must not be the
product of duress or coercion, either express or implied. Carmouche, 10 S.W.3d at 331. The
standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of
objective reasonableness, i.e., what the typical reasonable person would have understood by the
exchange between the officer and the suspect. Simpson v. State, 29 S.W.3d 324, 330 (Tex.App.--Houston [14th Dist.] 2000, pet. ref'd), citing Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801,
114 L.Ed.2d 297 (1991). When relying upon consent to justify the lawfulness of a search under the
Fourth Amendment, the State must prove by a preponderance of the evidence that the consent was
voluntary. United States v. Matlock, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974).

 There is no evidence that Trooper Greenwood or anyone else obtained Appellant's consent
by means of duress or coercion. The only issue is whether the State established that Appellant's
consent was positive and unequivocal. Trooper Greenwood consistently testified that Appellant
unequivocally consented to a search of the vehicle. When Greenwood asked Appellant whether he
had anything illegal in the vehicle, Appellant told Greenwood "to check." In order to clarify what
Appellant meant by this statement, Greenwood asked Appellant whether was giving him consent to
search the vehicle and its contents, and Appellant told him to "go ahead." Appellant offered
contradictory testimony. At one point, Appellant denied consenting at all because he did not own
the truck. Elsewhere in his testimony, he stated that he consented to Greenwood searching the
vehicle but he said he did not consent to a canine search. He also testified that he gave Greenwood
consent to search if the owner of the truck consented. It was the trial court's task to resolve this
factual dispute and to determine the credibility of the two witnesses on the issue. Accordingly, we
will defer to the trial court's implied finding that Appellant voluntarily and unequivocally consented
to a search of the truck and its contents. Point of Error Three is overruled. Having overruled each
point of error, we affirm the judgment of the trial court.


August 30, 2007 

 ANN CRAWFORD McCLURE, Justice


Before Chew, C.J., McClure, and Carr, JJ.


(Do Not Publish)