**Affirmed and Opinion Filed October 21, 2016**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-01542-CR

**THE STATE OF TEXAS, Appellant**
**V.**
**PHILLIP EMMANUEL TAYLOR, Appellee**

**On Appeal from the 439th Judicial District Court**
**Rockwall County, Texas**
**Trial Court Cause No. 2-14-590**

## MEMORANDUM OPINION

Before Justices Bridges, Lang-Miers, and Whitehill
Opinion by Justice Whitehill

This case turns on whether the trial court abused its discretion when it decided that detaining appellee for an additional 56-69 minutes after his traffic stop for a defective license plate light was completed to wait for a canine unit to arrive was unreasonable under the Fourth Amendment. The trial court found that it was, and granted appellee's motion to suppress approximately one hundred pounds of marijuana discovered and seized after the canine unit arrived.

The State argues that this was error because the officers had "individualized reasonable suspicion" for the continued detention and the length of detention "was not unreasonable as a matter of law."

For the reasons discussed below, we disagree and affirm the trial court's order.

# I.  Background

Joel Hoover, a Rockwall County Sheriff's Department deputy with years of drug interdiction experience, was patrolling I-30 in the early morning hours of 28 May 2014 when he noticed a dark-colored car, later identified as an Infiniti, traveling east.  According to Hoover, it was "a little bit rainy, a little bit foggy" that night, but he believed that the car's rear license plate lamp was not on.

Hoover testified that he intended to make a traffic stop, but the Infiniti exited at the TA truck stop.  While there, Hoover observed the Infiniti's two male occupants talking to the occupants of a Toyota pickup.  Both vehicles were parked away from the pumps, and neither was getting gas.  Initially, Hoover thought there "might have been some kind of confrontation," but determined that was not the case.

As Hoover got closer, the vehicle's occupants turned to look at him, and then "immediately dispersed back to their vehicles."  Although Hoover found this suspicious, he did not want to stay with the vehicles.  So he drove back to I-30 to wait for the vehicles to pass him on the highway.

The vehicles traveled east past Hoover, and the pickup was following the Infiniti within one to two car lengths.  Hoover described this conduct as "very close for the conditions and at nighttime."  Both vehicles had Tennessee plates, and Hoover learned when he ran the registration that both were registered to appellee.

Hoover called another patrol deputy, Michael Manning, who was further east on I-30 and asked him to stop the Infiniti while Hoover stopped the pickup.

Hoover stopped the pickup for following too closely.  The pickup was occupied by three Hispanic males.  The dash-cam video shows that the driver did not speak much English, and the front seat passenger spoke even less.  The backseat passenger, Navarro, spoke the best English.

So Hoover began communicating primarily with him. The men denied that they were traveling with anyone else. The conversations, however, all occurred by the side of the freeway with adjacent traffic noise heard on the dash-cam video.

Hoover also learned that the driver did not have a driver's license and that as best could be determined there were no outstanding warrants for any of the occupants.

In the meantime, further up the freeway, Manning had stopped the Infiniti, driven by appellee, for a partially lit license plate.

Appellee told Manning that he owned both the Infiniti and the pickup, and said that he was returning from bidding an apartment building remodel job in Lewisville. His shirt bore the logo of what appellee said was his construction company. Appellee also said that he had some guys "working down here."

Although Manning leaned toward the open passenger side window close enough that he could hear over the truck traffic noise what the driver and passenger said, he did not smell marijuana. (Nor did he testify that he saw anything in the car indicating that drugs were present.) Manning, however, had some concern because the Infiniti's passenger, Drake, "had absolutely no recollection of where he had been staying, anywhere he had gone, or any of the places he had [eaten]."

Hoover talked with Manning who reported that appellee was driving the Infiniti. According to Hoover, Manning relayed appellee's statement that he had not met his workers. Hoover then went back to Navarro, who told him that his boss (appellee) was in Nashville. But, because of his conversation with Manning, Hoover knew this was not true.

Hoover requested and was given permission to search the pickup, and he did his normal vehicle search, including the passenger compartment, engine compartment, truck bed, and under-carriage. Hoover found construction equipment but no drugs.

At Hoover's suggestion, Manning also asked appellee for consent to search the Infiniti, but appellee declined.

Hoover testified that he then instructed Rockwall dispatch get him a canine unit. But he later testified that he "told Deputy Manning to get a K-9 en route." Still later, Hoover testified that it could have been Corporal Kirby (also from the Rockwall Sheriff's Department who had since joined Manning on site) who directed Manning to call for the canine. Hoover later testified that he told one of them to call for the canine. Manning initially testified that it was Hoover who called for the canine unit, but was later unclear on the topic.

Nonetheless, Hoover obtained the canine officer's phone number and called for "his ETA." Lieutenant Moyer, the Kaufman County canine officer replied that he was "en route as fast as he could get there."[1] Moyer was contacted at 3:14, and he arrived with the dog at 3:57.

Moyer first stopped where Hoover had detained the pickup. The dog sniffed the truck and alerted to an odor. So the truck was searched again, but no drugs were found. Hoover released Navarro and his companions, who drove up the freeway. Although Hoover stopped the Toyota for following too closely, he never issued a citation or warning for that offense. Nor did he issue a citation or warning for not having a valid driver's license.

Hoover and Moyer then traveled to where Manning had detained appellee and Drake. Hoover thought it was odd that the pickup did not stop where the Infiniti was detained.

The dog alerted on the Infiniti several times. When Hoover opened the driver's door, there was "an overwhelming odor of raw marijuana emitting from the vehicle." The officers discovered approximately 100 lbs. of marijuana when they searched vehicle.

---

[1] Hoover called him "Deputy Moyer." The record does not clarify whether he was deputy Moyer at the time but has since been promoted to lieutenant.

Appellee was arrested without a warrant for marijuana possession and was subsequently indicted for possessing marijuana in an amount of 2,000 pounds or less but more than fifty pounds.[2] He then filed a motion to suppress and an amended motion that the trial court heard together.[3]

Hoover, Manning, and Moyer testified for the State at the hearing and videos of the Toyota and Infiniti stops were admitted into evidence. The Infiniti stop videos were played in court. A little more than half of the Toyota stop video was also played in court, and the trial court agreed to watch the rest later.

After taking the matter under advisement, the trial court granted the motion to suppress and filed findings of fact and conclusions of law. The conclusions of law state:

- Deputy Manning was justified to investigate a traffic violation of [appellee's] vehicle;

- The traffic stop and any justifiable detention thereafter was concluded at either the 21:30 mark or at best the 35-minute mark of the stop;

- The additional 56-69 minute detention of the vehicle and [appellee] was illegal.

The trial court's ruling forms the basis for this appeal.

## II. Analysis

In a single issue, the State argues that the trial court erred in granting the motion to suppress because the continued detention and the canine sniff were not unreasonable since the officers had "individualized reasonable suspicion" and the detention length was not unreasonable as a matter of law. As discussed below, we disagree.

---

[2] Drake was also arrested and indicted but subsequently died.

[3] Drake also moved to suppress. With the parties' agreement, the trial court conducted a joint hearing on both defendants' motions.

## A.  Standard of Review

We review a trial court's motion to suppress evidence ruling for an abuse of discretion, *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013), and overturn the ruling only if it is outside the zone of reasonable disagreement.  *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014).

The trial court's determinations of historical facts and mixed questions of law and fact that rely on credibility are granted almost total deference when supported by the record.  *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013).  But when mixed questions of law and fact do not depend on the evaluation of credibility and demeanor, we review the trial court's ruling de novo.  *Id*.  Whether the facts known to the officer at the time of the detention amount to reasonable suspicion is a mixed question of fact and law that is reviewed de novo on appeal.  *Id*.

## B.  Applicable Law

Under the Fourth Amendment, a warrantless detention of a person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion.  *Derichsweller v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011).

Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity.  *Castro v. State*, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007).  Otherwise stated, those specific, articulable facts must show unusual activity, some evidence that connects the detained individual to the unusual activity, and some indication that the unusual activity is related to crime.  *Derichsweiler*, 348 S.W.3d at 916.  Additionally, whether reasonable suspicion exits is based on an objective standard that disregards the officer's subjective intent.  *Furr v. State*, No. 0212-15, 2016 WL 5118607, at *5 (Tex. Crim. App. Sept. 21, 2016).  Furthermore, circumstances that an officer

relies on "must be sufficiently distinguishable from that of innocent people under the same circumstances as to clearly, if not conclusively, set the suspect apart from them. *Wade v. State*, 422 S.W.3d 661, 670 (Tex. Crim. App. 2013).

A traffic stop is a detention, and must therefore be reasonable under the United States and Texas Constitutions. *See Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997). "To be reasonable, a traffic stop must be temporary and last no longer than necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

Determining whether an investigative detention is reasonable is a two-pronged inquiry, focusing first on whether the officer's action was justified at its inception and then on whether the action was "reasonably related, in scope, to the circumstances that justified the stop in the first place." *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004) (citing *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968)). This is a factual determination made by considering the totality of the circumstances existing throughout the detention. *Belcher v. State*, 244 S.W.3d 531, 538–39 (Tex. App.—Fort Worth 2007, no pet.). And "an investigative stop that is reasonable at its inception may violate the Fourth Amendment because of excessive intensity or scope." *Davis*, 947 S.W.2d at 243.

Regarding the length of detention, "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *United States v. Place*, 462 U.S. 696, 709 (1983). There is, however, no rigid time limit. *See St. George v. State*, 237 S.W.3d 720, 727 (Tex. Crim. App. 2007). Instead, the issue is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly . . . ." *United States v. Sharpe*, 470 U.S. 675, 685 (1985).

The "tolerable duration" of the stop "is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. U.S.*, 135 S.Ct. 1609, 1614 (2015).

Accordingly, during a routine traffic stop, police officers may request a driver's license and car registration to conduct a computer check on that information. *See Kothe*, 152 S.W.3d at 63. A request for insurance information, the driver's destination, and the purpose of the trip are also proper inquiries. *Ortiz v. State*, 930 .W.2d 849, 856 (Tex. App.—Tyler 1996, no pet.). But an officer "may not do so in a way that prolongs the stop, absent reasonable suspicion that ordinarily demanded to justify detaining an individual." *Rodriguez* , 135 S.Ct. at 1615. And the stop may not be used as a "fishing expedition for unrelated criminal activity." *Davis*, 943 S.W.2d at 243.

Typically, a traffic-stop investigation is fully resolved after the computer check is completed and the officer knows that the driver has a valid license, no outstanding warrants, and the car is not stolen. *Kothe*, 152 S.W.3d at 63–64. The detention must end at this point and the driver must be permitted to leave unless there is another proper basis for the investigatory detention. *Id*. at 64. That is, there must be reasonable suspicion regarding a different offense to support further detention. *See Rodriguez,* 135 S.Ct. at 1615; *Davis*, 947 S.W.2d at 243.

Furthermore, a dog sniff is aimed at detecting ordinary criminal activity and is not an ordinary incident of a traffic stop. *Rodriguez*, 135 S.Ct. at 1615. Thus, absent facts showing reasonable suspicion that a different offense has been, is being, or soon will be committed, the officer may not prolong the traffic stop to conduct a dog sniff. *Id*. at 1614-16.

## C.     Was appellee's detention "illegal"?

The trial court found that Manning was justified to investigate appellee's traffic violation and the validity of this initial detention is not contested here. The issue is whether, after that

investigation concluded, Manning had reasonable suspicion to continue detaining appellee until the canine unit arrived.

Urging the collective knowledge doctrine, the State identifies several facts that it claims created reasonable suspicion to detain appellee for an hour once the traffic-stop procedures were completed.[4] These facts include: (i) Hoover's observation of the Infiniti and the pickup at the gas station and the fact that neither vehicle was getting gas; (ii) the individuals from the two vehicles were conversing at the gas station and then dispersed when they saw him; (iii) the pickup was following the Infiniti closely, between one and two car lengths, and Hoover thought that was "a little odd;"[5] (iv) Navarro's statement to Hoover that appellee was in Nashville, which Hoover knew was untrue; (v) two cars with Tennessee plates registered to the same person; (vi) Hoover's suspicion that "it was probably narcotics;" (vii) that Hoover thought Navarro would stop where the Infiniti was detained after he let Navarro go; and (viii) that it is "very common for cars that are running large amounts of narcotics to travel in pairs or groups."[6] Based on these facts, the State contends that "there was an objectively justifiable basis for the detention . . . ."

The State relies on *Mathews v. State*, 431 S.W.3d 596, 603 (Tex. Crim. App. 2014) to support its premise that appellee's approximately 90-minute detention properly continued until the officers waited for a drug dog to resolve their suspicion of illegal drug activity. *Mathews*, however, is distinguishable from this case.

In *Mathews*, the investigation was specifically directed toward a narcotics violation from the very beginning. There, the police responded to an anonymous tip that a black male named

---

[4] The collective knowledge doctrine allows consideration of the cumulative knowledge of cooperating officers in determining reasonable suspicion. *See Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987); *Wilhite v. State*, 937 S.W.2d 604, 607 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd).

[5] Hoover also testified that this tandem travel arrangement was a text book sign of drug activity.

[6] The State also identifies factors such as the weather conditions that night, that the vehicles were travelling eastbound, and the absence of other traffic, but does not indicate how these facts are relevant to the determination.

Neal Mathews, described as wearing a white muscle shirt and dark pants, was selling crack out of a white van parked in front of a store in a high crime area. *Id*. at 600. When an officer approached the van, it was sitting in the parking lot with the keys in the ignition. The black man inside the van was wearing a white muscle shirt with dark pants and identified himself as Cornelius Williams. His left hand was hidden from view, and because the officer feared a weapon, he asked Williams to show him his right hand. Williams ignored him. When the officer asked again and Williams failed to comply, the officer asked him to step out of the van. *Id.*

When Williams heard the officer call for a canine unit, he became visibly nervous and took off running. Williams was caught and returned to the squad car, and the search following the canine "open air sniff" revealed marijuana and crack cocaine. *Id*.

Here, however, Manning stopped appellee's car for a defective license plate light. Manning conceded that it took only a few seconds to determine that the light was defective. Nor did it take long to determine that appellee had a valid driver's license and that the car was registered to him.

The trial court also found that appellee and his passenger were relaxed during Manning's questioning and detention, made appropriate eye contact, and answered all questions promptly and without hesitation. The trial court further found that neither person showed signs of nervousness, and Manning did not smell marijuana. There is no testimony about observed drugs or drug paraphernalia in Manning's Infiniti.

Seventeen minutes into the detention, Manning received confirmation that neither appellee nor his passenger had any outstanding warrants. A minute later, Manning asked appellee for consent to search his car, which request appellee denied.

The trial court also found that, "Deputy Manning testified he continued to detain [appellee] after the request for consent to search the vehicle because Deputy Hoover informed

–10–

him a canine unit had been requested." In fact, Manning admitted that after the warrant and registration check, he had completed all traffic-stop related issues and was just waiting for the canine unit to arrive.[7] As the Supreme Court has observed, however, "a dog sniff is not fairly characterized as part of the officer's traffic mission." *Rodriguez*, 135 S.Ct. at 1615. And the trial court found that "Deputy Manning did not articulate any other reasons for the continued detention." The State did not challenge the evidentiary sufficiency of this finding.

Subsequently, about twenty-one minutes into the stop, Manning is on the phone with Hoover and can be heard asking, "how do I explain that to him where [he] does not throw a fit?" The trial court could have reasonably construed that statement as Manning's recognition that continued detention was not appropriate.

At about thirty-five minutes into the stop, Manning told appellee that they were waiting for a canine unit from Kaufman. The trial court found that "[t]his is the latest point in the stop that any argument can be made as to a proper duration of the initial stop of the vehicle or any concerns investigated thereafter other than waiting for the canine." Approximately 56 minutes later, the canine approached the vehicle.

At one point, Hoover told Manning that he (Manning) would have to decide what to do with appellee because Hoover was not at Manning's location and Manning would have a better idea of what to do.

Moreover, there were inconsistencies in, and questions concerning, the State's evidence that the trial court reasonably could have resolved against the State. For example, Hoover thought it was suspicious that the vehicles traveled in tandem, but he also testified that it was suspicious that the pickup did not stop where the Infiniti had been detained.

---

[7] Hoover testified that his search "wasn't complete until I was going to let the dog run on this car as well. . . . I physically stopped searching [the Toyota], but I was going to run the dog on it, as well."

When asked whether the investigation for following too closely was over right away because he had observed that violation, Hoover answered "no" because there could have been road rage or the driver could have been intoxicated. But these questions could have been determined quickly. And Hoover did not ask whether the Toyota driver had been drinking because he did not smell any alcohol and there was nothing in the vehicle to indicate drinking. Additionally the videos dispel notions of road rage or drunk driving.[8] (The same facts also apply to appellee and Drake as seen in Manning's videos.)

In addition, Manning was near the Infiniti for approximately ninety minutes, and even can be seen placing his head at the open passenger window so he could hear appellee and Drake over the truck traffic noise and he did not smell marijuana.[9] But immediately after the dog alert, Hoover opened the car door and said there was no doubt in his mind that the marijuana odor was "overwhelming."[10] It is at this point that Manning says he smells it too.

As another example, Hoover testified while watching his dash-cam video that it was "really unusual" that there was "absolutely no other traffic" while he was driving and saw the Toyota following too closely behind the Infiniti. But the video shows on-coming traffic and Hoover was in the left lane and the Toyota was in the right lane so that no traffic could pass them in their direction. Once both vehicles are pulled over, the video shows traffic travelling in Hoover's direction.

Additionally, Hoover testified that he could not remember whether he crawled underneath the Toyota truck while he was searching it, but his videos show approximately half of his body under the truck on two different occasions.

---

[8] Hoover said that he thought there might be a confrontation at the TA station where he saw both vehicles together.

[9] Manning addressed this discrepancy by saying that Drake loosed a large puff of cigarette smoke when Manning talked with him through the passenger window. But neither Manning nor Hoover testified that either appellee or Drake smelled of marijuana.

[10] Nonetheless, Hoover's smelling of the marijuana occurred after the dog arrived and could not have been grounds for continuing the detention until that time.

As to when his traffic-stop investigation was over, Hoover testified that:

Q.      I guess I'm asking you, beyond the traffic stop and not having a license, you are investigating other offenses from the moment of the initial detention ?

A.      Sure.

Q.      And you delayed, let's say, writing a citation or issuing a warrant in order to further your investigation of other offenses?

A.      Well, once I spoke to the occupants of the vehicle, we've moved way past. We moved way past a citation for following too close at this point. We've got something -- something bigger afoot. We've got something bigger amiss.

Furthermore, Hoover's demeanor and credibility were in the mix when he testified that the close-following was "really unusual" because:

There is absolutely no other traffic. And as you can see, there's points where he's less than a car length. That's -- that's very unsafe, but it also very suspicious in terms of criminal interdiction and interdiction of narcotics [because] It's -- it's -- it's very common for cars that are running amounts of narcotics to travel in pairs or groups. This is pretty much a textbook case of -- of that situation where you've got one vehicle  attempting to, you know, to keep me from pulling in front of it. They're not giving me enough room to conduct a traffic stop. I've seen this numerous times all over the state of Texas.

When then asked whether, "given the lack of other transportation on the road or traffic on the road," the vehicle had any other reason to be travelling behind the other vehicle so closely, Hoover answered, "Absolutely none." But he never asked the occupants if there was a reason for doing so.

Similarly, discussions between the officers recorded on their videos show that a substantial factor for their suspicions arises from Hoover's understanding of various statements by the Toyota occupants, including their denials that they were traveling with appellee.[11]  But Hoover's dash-cam video shows that the Toyota driver speaks little English. And Hoover said that the front passenger spoke less English than the driver but that the rear passenger (Navarro)

---

[11]Appellee, however, admitted traveling with the Toyota occupants, who he said were his employees.

–13–

was fluent. The road noise from the passing traffic, however, makes it hard to clearly understand from the video what is actually being said. And Hoover admitted that he did not give the driver's statements much weight due to the language barrier.

Moreover, the record reasonably suggests that Hoover, who has extensive narcotics interdiction experience, suspected that drugs were involved from the outset but he did not then call for a drug dog. Instead, he waited approximately 29 minutes into that stop before that call was made.

Also significant is the 56 minute scene on Manning's video where appellee and the officers are seen and heard having casual conversations filling time while they wait for Lieutenant Moyer and the drug dog to get from Kaufman to Rockwall where they searched the Toyota without success and then traveled to Manning's stop. The trial court watched this scene and assessed its impact.

The State also cites several cases to argue that the length of the continued detention was reasonable. *See, e.g., Strauss v. State*, 121 S.W.3d 486, 492 (Tex. App.—Amarillo 2003, pet. ref'd) (delay to wait for canine unit not unreasonable after driver stopped for speeding, he and his passenger gave conflicting stories, and a consensual search revealed the small amount of burnt marijuana in a shaving kit and fresh marijuana in another compartment of the vehicle). This argument, however, presupposes that Manning had reasonable suspicion to justify the continued detention. It is axiomatic that the length of the delay is not an issue if the officer did not have reasonable suspicion to extend the detention in the first place. *See, e.g., Rodriguez*, 135 S.Ct. at 165 (drug dog sniff initiated seven to eight minutes after traffic stop completed and citation issued unnecessarily prolonged the stop).

Based on the totality of the circumstances, one could reasonably conclude, as the trial court did, that the continued detention was unreasonable. Thus, we conclude that the trial court did not abuse its discretion in granting the motion to suppress.

### III.  Conclusion

Having resolved the State's sole issue against it, we affirm the trial court's order.

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
151542F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-15-01542-CR        V.

PHILLIP EMMANUEL TAYLOR,
Appellee

On Appeal from the 439th Judicial District
Court, Rockwall County, Texas
Trial Court Cause No. 2-14-590.
Opinion delivered by Justice Whitehill.
Justices Bridges and Lang-Miers
participating.

Based on the Court's opinion of this date, the trial court's order is **AFFIRMED**.


Judgment entered October 21, 2016.