**Opinion filed October 10, 2019**



# In The

# Eleventh Court of Appeals

_____

## No. 11-17-00247-CR

_____

## JEFFERY LYNN ADAMS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 132nd District Court**

**Scurry County, Texas**

**Trial Court Cause No. 10460**

### M E M O R A N D U M   O P I N I O N

The jury convicted Jeffery Lynn Adams of possession of four grams or more but less than 200 grams of methamphetamine. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(d) (West 2017). The jury assessed Appellant's punishment at confinement for a term of eight years in the Institutional Division of the Texas Department of Criminal Justice and a fine of $2,500. The trial court sentenced

Appellant accordingly. In two issues, Appellant challenges the trial court's denial of (1) Appellant's motion to suppress evidence obtained as a result of a canine sniff of his vehicle and (2) Appellant's challenges against potential jurors for cause. We affirm.

*Background Facts*

At approximately 10:40 p.m. on June 16, 2016, Snyder Police Officer Alex Gallagher stopped a pickup for having an expired registration on the trailer it was pulling. A recording from Officer Gallagher's dashcam was admitted into evidence and played for the jury. Appellant was the only person in the vehicle. Officer Gallagher testified that he noticed that, throughout the stop, Appellant seemed "more nervous than normal." Officer Gallagher explained that Appellant "would tap his foot whenever he would answer a question" and "look off and kind of pause for a moment and then come back." Appellant produced his driver's license but could not immediately locate his proof of insurance.

While speaking with Appellant, Officer Gallagher noticed numerous items in the vehicle, including a "red firefighter bag." When asked about the bag, Appellant stated that he had been a volunteer firefighter with the Woodrow Fire Department. Officer Gallagher asked Appellant who the chief of the department was. Appellant responded, "I don't know since I've been gone so long," but Appellant indicated that he knew a Chief Tyson, who had died. When Officer Gallagher asked Appellant when he worked at the fire department, Appellant did not give a direct answer. Officer Gallagher testified that he was suspicious because "the information [Appellant] gave [him] didn't match up to the information that [he] was familiar with about the department." Officer Gallagher noted that "[a]t that point [he] wasn't sure . . . if we had possible stolen firefighter equipment there."

2

Officer Gallagher then spoke with Appellant about other matters, but Appellant still appeared to be nervous and Officer Gallagher remained suspicious about the firefighter gear bag. As a result, Officer Gallagher asked Appellant to step out of his vehicle six minutes after Officer Gallagher stopped Appellant. Officer Gallagher shined his flashlight on Appellant's trailer but did not see any visual signs that would indicate the presence of narcotics or stolen items on the trailer.

Officer Gallagher returned to his patrol car and ran Appellant's driver's license. Officer Gallagher then called the Woodrow Fire Department and determined that the current chief was Wesley Boone and that the department was unaware of any stolen gear. Officer Gallagher stated that he "didn't put [Boone's] name out there because [he] wanted to keep fishing." Dispatch informed Officer Gallagher that Appellant's vehicle insurance was "unconfirmed."

Officer Gallagher again questioned Appellant about the firefighter bag, and Appellant responded that the bag was his and that it contained a television, clothes, and other personal items. Then, Officer Gallagher asked Appellant about his criminal history, and Appellant replied that he had been arrested about forty years prior for possession of marihuana. Officer Gallagher testified that he asked Appellant about the last time Appellant had used marihuana, but Appellant provided a vague answer. Officer Gallagher further testified that, when he asked Appellant about his use of illegal narcotics, Appellant took about ten seconds to respond and "when he did he looked back to the vehicle, which can be a behavior when you look back to your illegal substance that you have."

Appellant offered to let Officer Gallagher search the firefighter gear bag but refused to consent to a search of his vehicle. Officer Gallagher stated that Appellant

3

appeared nervous and "couldn't keep still." Officer Gallagher asked Appellant about his nervous behavior, and Appellant responded that he had ADHD and restless leg syndrome. At that point, Officer Gallagher told Appellant that Officer Gallagher had a dog with him and that he was going to conduct a canine sniff on Appellant's vehicle. Appellant then spoke to someone on the phone, who stated that she was unable to locate his current insurance policy but would continue searching for it. Officer Gallagher told Appellant to give him his cell phone and sit in the back of his patrol car, but Appellant refused. Officer Gallagher then placed Appellant in handcuffs and instructed him to stand near the edge of the road. Officer Gallagher told another officer, who had arrived at the scene, that Appellant was being "uncooperative."

About two minutes later, Officer Gallagher conducted a canine sniff of Appellant's vehicle using Officer Gallagher's canine. The canine alerted to the presence of drugs on the passenger's side of the vehicle, between the bed and the cab of the pickup. Officer Gallagher then searched the pickup and found a glass pipe and approximately six grams of methamphetamine. It was not until after Officer Gallagher's canine had already alerted to the presence of narcotics in Appellant's vehicle that Appellant's insurance was positively confirmed by dispatch.

Appellant subsequently filed a motion to suppress. Appellant argued that he was wrongfully detained at the time the canine sniff and subsequent search were conducted and that, therefore, all "evidence seized by law enforcement . . . in connection with the detention and [his] arrest" should be suppressed. At the hearing on Appellant's motion to suppress, Appellant argued that "the detention in this case went far beyond the extent required for the officer to complete his mission under the law." The State countered that, at the time of the canine sniff, Appellant "still had

4

not produced a valid insurance card. . . . And so the purpose of the stop had not concluded." The trial court denied Appellant's motion to suppress.

*Motion to Suppress*

In his first issue, Appellant contends that the trial court erred when it denied his motion to suppress evidence discovered as a result of the canine sniff of Appellant's vehicle. Appellant does not contest Officer Gallagher's basis for initiating the stop. However, Appellant contends that Officer Gallagher unduly prolonged the traffic stop because Appellant's registration was determined to be expired at the time of the stop, and Officer Gallagher did not have reasonable suspicion to continue the detention. Appellant also contends that Officer Gallagher's statement that he wanted to "keep fishing" for information about Appellant's firefighter gear bag proves that Officer Gallagher unduly prolonged the traffic stop. Appellant asserts that the canine sniff violated his rights under the Fourth Amendment of the United States Constitution and Article I, section 9 of the Texas Constitution.

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011). In reviewing a ruling on a motion to suppress, we apply a bifurcated standard of review. *Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016); *Martinez*, 348 S.W.3d at 922–23. We afford almost total deference to the trial court's determination of historical facts, and of mixed questions of law and fact that turn on the weight or credibility of the evidence. *Brodnex*, 485 S.W.3d at 436; *Martinez*, 348 S.W.3d at 922–23. We review de novo the trial court's determination of pure questions of law, and mixed questions of law and fact that do not depend on

5

credibility determinations. *Brodnex*, 485 S.W.3d at 436; *Martinez*, 348 S.W.3d at 923.

When, as in this case, there are no written findings of fact in the record, we uphold the trial court's ruling on any theory of law applicable to the case and presume the trial court made implicit findings of fact in support of its ruling so long as those findings are supported by the record. *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000). We view a trial court's ruling on a motion to suppress in the light most favorable to the trial court's decision. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). At a suppression hearing, the trial court is the sole judge of the credibility of the witnesses and is free to believe or disbelieve any or all of the evidence presented. *See id.* at 24–25. If supported by the record, a trial court's ruling on a motion to suppress will not be overturned. *Mount v. State*, 217 S.W.3d 716, 724 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

As noted previously, Appellant challenges the duration of the stop based on Officer Gallagher's subjective intent—to the effect that he wanted to "keep fishing." A traffic stop is not rendered unreasonable for Fourth Amendment purposes where the officer's subjective purpose in taking a particular action was unrelated to the legal justification for the stop. *Ohio v. Robinette*, 519 U.S. 33, 38–39 (1996).

The Supreme Court's decision in *Rodriguez v. United States* guides our analysis of Appellant's challenge to the duration of the traffic stop. 135 S. Ct. 1609 (2015). "A seizure for a traffic violation justifies a police investigation of that violation." *Id.* at 1614. "[T]he tolerable duration of police inquiries in the traffic-stop context" must be tailored to addressing the traffic violation that warranted the stop and addressing any related safety concerns. *Id.* During an investigative traffic stop, an officer is entitled to make inquiries incident to the traffic stop, including

6

checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* at 1615. "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* Additionally, an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop." *Id.* However, "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* Texas courts have followed the same approach in defining the scope of a traffic stop. *Lerma v. State*, 543 S.W.3d 184, 193–94 (Tex. Crim. App. 2018) (citing *Kothe v. State*, 152 S.W.3d 54, 63–64 (Tex. Crim. App. 2004)); *Davis v. State*, 947 S.W.2d 240, 245 n.6 (Tex. Crim. App. 1997).

Because a canine sniff is aimed at detecting evidence of ordinary criminal wrongdoing, it is not part of a valid traffic mission. *Rodriguez*, 135 S. Ct. at 1615. Therefore, once the officer's traffic mission has been completed, the officer cannot prolong the detention in order to perform a canine sniff—unless the officer has "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615.

> "Reasonable suspicion" exists if the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaging in criminal activity. This standard is an objective one: there need only be an objective basis for the stop; the subjective intent of the officer conducting the stop is irrelevant. The reasonable suspicion determination is made by considering the totality of the circumstances.

*Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001) (footnotes omitted). "The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff 'prolongs'—i.e., adds

7

time to—'the stop.'" *Rodriguez*, 135 S. Ct. at 1616. "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 410 (2005). "Likewise, a canine sniff is not a search under Article I, section 9 of the Texas Constitution." *Johnson v. State*, 323 S.W.3d 561, 564 (Tex. App.—Eastland 2010, pet. ref'd); *see also Caballes*, 543 U.S. at 410.

In this case, Appellant was stopped for failure to maintain a valid registration on the trailer attached to his vehicle. Appellant asserts the reason for the traffic stop—an expired registration—had been, or ought to have been, completed before Officer Gallagher conducted the canine sniff. Although Officer Gallagher did not issue a citation for Appellant's expired registration, Officer Gallagher determined that the trailer's registration was expired prior to initiating the traffic stop. Therefore, Appellant contends that the purpose of the traffic stop should have been completed shortly after Appellant was pulled over. Appellant asserts that his constitutional rights were violated when law enforcement continued to detain him once the purpose of the stop had been completed because Officer Gallagher had no articulable facts to justify a reasonable suspicion of criminal activity.

The State asserts, however, that "Officer Gallagher was entirely within his rights to conduct a free air sniff while Appellant was still seeking to find proof of his insurance, and the duration of the traffic stop was not unconstitutionally extended by the sniff." We agree.

The Transportation Code provides that "[a] person may not operate a motor vehicle in this state unless financial responsibility is established for that vehicle." *See* TEX. TRANSP. CODE ANN. § 601.051 (West 2011). Further, as a condition of

operating a motor vehicle in this State, the operator must provide evidence of financial responsibility to a peace officer upon request. *See id.* § 601.053 (West Supp. 2018). Proof of motor vehicle liability insurance is one of the ways that a vehicle driver may provide evidence of financial responsibility. *See id.* We assume that the vast majority of Texas drivers comply with the financial responsibility requirements for driving by obtaining motor vehicle liability insurance.

Officer Gallagher testified that he had been unable to complete his traffic stop duties before conducting the canine sniff because Appellant was unable to provide proof of insurance and because dispatch had informed him that Appellant's insurance was "unconfirmed." Further, Appellant continued to search for his proof of insurance after Officer Gallagher informed Appellant that he had decided to conduct a canine sniff on Appellant's vehicle. Appellant's insurance was not confirmed until after Officer Gallagher's canine had already alerted to the presence of narcotics in Appellant's vehicle. The canine sniff, therefore, was conducted during the time that Officer Gallagher was making inquiries related to the purposes of the initial traffic stop—i.e., while Appellant was still attempting to locate evidence of financial responsibility. As noted by the court in *Rodriguez*, the task of ensuring that vehicles on the road are operated "responsibly" is a part of a traffic-stop investigation. 135 S. Ct. at 1615; *see Lerma*, 543 S.W.3d at 190. Because the traffic-stop investigation was not fully resolved at the time of the canine sniff, we need not address whether reasonable suspicion existed to prolong the traffic stop to investigate potential theft. *See Rodriguez*, 135 S. Ct. at 1615.; *Lerma*, 543 S.W.3d at 194; *Kothe*, 152 S.W.3d at 63–64.

Appellant also contends that, if Officer Gallagher had not completed the traffic-stop investigation before performing the canine sniff, he was dilatory in doing

9

so to buy more time. *See Rodriguez*, 135 S. Ct. at 1615. We disagree. There is no evidence that Officer Gallagher delayed asking for proof of insurance from Appellant, and there is no dispute that Officer Gallagher was unable to confirm proof of insurance, either from Appellant or dispatch, prior to the canine sniff. Thus, the trial court did not err in denying Appellant's motion to suppress. We overrule Appellant's first issue.

*Challenges for Cause*

In his second issue, Appellant contends that the trial court erred by denying fifteen[1] of his sixteen challenges for cause of veniremembers. Appellant contends that he was denied a fair trial because the objectionable jurors "either explicitly stated they could not follow the law [or] that a particular bias would affect their verdict, and in some cases both." Certain prerequisites demonstrating harm must be established to preserve error. *Buntion v. State*, 482 S.W.3d 58, 83 (Tex. Crim. App. 2016). Appellant satisfied those prerequisites. The record shows that Appellant (1) made sixteen challenges for cause, fifteen of which were unsuccessful; (2) used seven peremptory challenges on the complained-of potential jurors (Evette Peterson, Roger Moore, Carlton Dennis, Bradley Overcash, Azucena Gonzales, Abel Escobedo, and Barbara Pendleton); (3) exhausted all of his peremptory strikes; (4) was denied his request for nine additional strikes; and (5) was forced to accept five jurors that he found to be objectionable (Shonna Butler, Gary Scott, Nancy Ball, Joseph Jackson, and Paula Danielle). Therefore, Appellant generally preserved error. *See id.*

---

[1]In the statement of his second issue, Appellant asserts that he is challenging the trial court's ruling on eleven of the veniremembers that he challenged for cause. In the argument in support of his second issue, however, he lists fifteen veniremembers. Accordingly, we will consider Appellant's second issue as applying to all fifteen veniremembers named in Appellant's brief.

10

However, although in some instances the prospective jurors are identified by the prosecutor or Appellant's counsel, the reporter's record largely does not identify the names of prospective jurors as they answered questions. Instead, the reporter's record identifies each member of the venire panel as "prospective juror" as the person orally answered questions during voir dire. As set forth below, the lack of identifying information for the prospective jurors that answered questions during voir dire precludes appellate review for many of the veniremembers that Appellant challenged for cause.

"A prospective juror is challengable for cause if he or she has a bias or prejudice against the defendant or against the law upon which either the State or the defense is entitled to rely." *Id.* at 83–84; *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); *see* TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(9), (c)(2) (West 2006). The test is whether the prospective juror's bias or prejudice would substantially impair his ability to carry out his duties in accordance with his instructions and his oath. *Buntion*, 482 S.W.3d at 84 (citing *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Gardner*, 306 S.W.3d at 295). To establish a challenge for cause on one of these bases, the proponent must show that the prospective juror understood the requirements of the law and could not overcome his bias or prejudice well enough to follow the law. *Buntion*, 482 S.W.3d at 84 (citing *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010)).

The proponent of a challenge for cause has the burden to show that the challenge was proper. *Feldman v. State*, 71 S.W.3d 738, 747 (Tex. Crim. App. 2002). The proponent does not meet that burden until the record shows that the prospective juror understood the requirements of the law and could not overcome any bias or prejudice. *Woodall v. State*, 350 S.W.3d 691, 696 (Tex. App.—Amarillo

11

2011, no pet.) (citing *Feldman*, 71 S.W.3d at 747). Thus, a party seeking to exclude a prospective juror because of bias or prejudice must demonstrate, through questioning, that the prospective juror lacks impartiality. *Buntion*, 482 S.W.3d at 84 (citing *Witt*, 469 U.S. at 423). "Before a prospective juror may be excused for cause on this basis, the law must be explained to him, and he must be asked whether he can follow that law, regardless of his personal views." *Id.* (citing *Feldman*, 71 S.W.3d at 744).

A trial court's ruling on a challenge for cause may be reversed only for a clear abuse of discretion. *Id.* "In making this decision, we examine the voir dire of the prospective juror as a whole and determine whether the record shows that the prospective juror's convictions would interfere with his ability to serve as a juror and to abide by the oath." *Id.* "We afford great deference to the trial court's decision because the trial judge is present to observe the demeanor of prospective jurors and to listen to tones of voice." *Id.* "Particular deference is due when the prospective juror's answers are vacillating, unclear, or contradictory." *Id.*

At the end of the voir dire examination, Appellant made his challenges for cause naming sixteen veniremembers that he objected to and stating the grounds for his objections. After receiving argument from the prosecutor and defense counsel, the trial court overruled all of the challenges for cause with the exception of one challenged veniremember. Thus, veniremembers were not individually questioned after Appellant made the challenges for cause.

As we previously noted, for the most part, the reporter's record does not identify veniremembers by name or number whenever they orally responded to

questions. For eleven[2] of the fifteen veniremembers that are the subject of Appellant's second issue, Appellant has not cited to any portion of the reporter's record where these eleven veniremembers made an oral response during voir dire. Instead, Appellant has cited only to the part of the reporter's record where defense counsel made a challenge for cause to these eleven veniremembers at the end of voir dire. For these eleven veniremembers, Appellant has not met his burden to show, in the record, that the prospective juror understood the requirements of the law and could not overcome any bias or prejudice. *See Feldman*, 71 S.W.3d at 747; *Woodall*, 350 S.W.3d at 696. In this regard, Appellant has not demonstrated *through questioning* a lack of impartiality of these eleven prospective jurors. *Buntion*, 482 S.W.3d at 84. We will address the remaining four veniremembers individually.

Furthermore, Appellant challenged fifteen veniremembers on the basis that they could not follow an Article 38.23 instruction to disregard evidence that they might determine was illegally obtained. *See* CRIM. PROC. art. 38.23 (West 2018).[3] Appellant challenged eight[4] veniremembers solely on this basis. The prosecutor argued that he did not believe that the veniremembers understood defense

---

[2]These eleven veniremembers are as follows: Carlton Dennis, Gary Scott, Azucena Gonzales, Nancy Ball, Abel Escobedo, Joseph Jackson, Paula Danielle, Craig Leatherwood, Tamara Dominguez, Howell Scott, and Barbara Pendleton.

[3]Article 38.23(a) provides in relevant part as follows: "In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained." *See Madden v. State*, 242 S.W.3d 504, 509–10 (Tex. Crim. App. 2007) (setting out the requirement for obtaining an Article 38.23 instruction). The court's charge to the jury did not contain an Article 38.23 instruction. Appellant requested an Article 38.23 instruction, but the trial court denied the request on the basis that there was not a genuine dispute about a material fact to warrant the instruction. *See id.* On appeal, Appellant has not challenged the denial of the requested Article 38.23 instruction.

[4]These eight veniremembers are as follows: Shonna Butler, Gary Scott, Joseph Jackson, Paula Danielle, Craig Leatherwood, Tamara Dominguez, Howell Scott, and Barbara Pendleton.

13

counsel's questions pertaining to the jury's consideration of an Article 38.23 instruction. The trial court agreed with the prosecutor's argument, stating that many of the veniremembers did not understand defense counsel's questions about the Article 38.23 instruction.

We agree with the trial court's determination that the veniremembers did not understand the questions and hypotheticals posed by defense counsel about Article 38.23. This is an example of the questioning and discussion among multiple prospective jurors:

> [DEFENSE COUNSEL]: All right. I've got a couple more questions about something. I'm going to ask -- I'm going to do another hypothetical. I know y'all didn't like that one hypothetical, but I've got to ask this question, okay? In the law -- I'm just going to read it for you real fast. There's a provision in the law that says that if an officer seizes evidence of a crime illegally, and that there's a question of fact about whether or not that evidence was seized illegally, and a jury believes that the officer seized that evidence illegally then they have to return a verdict of not guilty. Okay. I'm going to give it to you in a hypothetical, okay? Let's pretend --

> [PROSECUTOR]: Your Honor, sorry, I have to object. It's a slight misstatement. I don't -- I'm not sure he meant to misstate it.

> [DEFENSE COUNSEL]: Why don't I just read 38.23 for the jury so we don't have a misstatement, okay? "No evidence obtained by an officer or other person in violation of any provision of the Constitution or laws of the State of Texas, or of the Constitution or the laws of the United States of America, shall be admitted into evidence against the accused on the trial of any criminal case. In any case where the legal evidence raises an issue under -- hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this article, then and in such event, the jury shall disregard any such evidence so obtained."

So instead of me getting up here and reading y'all legalese, I'm going to put it like this. Let's say someone is driving down the road and all of a sudden they run a stop sign, or an officer pulls them over because he says, "I saw them run a stop sign." And he goes up there, and through his investigation he finds some marijuana, smells it, whatever. There's no doubt that that person -- just pretend like he's smoking the joint right there in front of the officer, okay? But let's pretend that during the course of that trial evidence came up that made a jury believe that that officer never saw him run a stop sign, that that officer pulled him over for no reason, and the Court said that you have to disregard that evidence of that marijuana if you believe that that officer pulled him over for no reason.

So does everyone kind of understand the question I asked? Okay. Mr. McDowell, you kind of nod your head. Would you be able to follow the law there and say, "You know what, I can disregard that evidence"?

PROSPECTIVE JUROR: (Indicating in the affirmative)

[DEFENSE COUNSEL]: Okay. Is there anyone who thinks, "You know what, I can't disregard that evidence"?

PROSPECTIVE JUROR: I couldn't.

[DEFENSE COUNSEL]: Okay. And, Mr. Moore, you raised your hand, too, right?

PROSPECTIVE JUROR: Yes.

[DEFENSE COUNSEL]: You couldn't? So, Mr. Moore, basically if you were presented with the evidence and you believed that the officer had seized that evidence illegally, you couldn't disregard that evidence and vote not guilty?

PROSPECTIVE JUROR: Did he have probable cause to pull him over? He said he saw him a run a stop sign. That's what you said.

15

[DEFENSE COUNSEL]: Yes, sir. And during the rest of my hypothetical[,] evidence came out that showed that that never happened.

Under the hypothetical initially given by defense counsel, the law enforcement officer saw the defendant run a stop sign. When defense counsel attempted to change the hypothetical, the prospective jurors that spoke on the record apparently still assumed that the officer had testified that he saw the defendant run the stop sign. In addition to the confusing nature of the questions dealing with Article 38.23, the trial court was in the best position to evaluate the veniremembers' comprehension of the questions as well as their responses, both verbal and nonverbal. *See Buntion*, 482 S.W.3d at 84. Accordingly, the trial court did not abuse its discretion by overruling all of Appellant's challenges for cause based upon the ability to follow an Article 38.23 instruction.

*Evette Peterson*

Appellant asserts that the trial court erroneously denied his challenge for cause against potential juror Evette Peterson because Peterson stated that she was married to a police officer for fifteen years and would believe a police officer's testimony over another witness's testimony if there was a conflict. A prospective juror "who cannot impartially judge the credibility of witnesses is challengeable for cause for having a bias or prejudice in favor of or against the defendant." *Feldman*, 71 S.W.3d at 745; *see* CRIM. PROC. art. 35.16(a)(9). Impartiality with respect to the credibility of witnesses does not, however, mean that the juror must have no views on what characteristics make a witness more or less credible. Instead, a defendant "is entitled to jurors who will be genuinely open-minded and subject to persuasion, with no extreme or absolute positions regarding the credibility of any witness." *Feldman*, 71 S.W.3d at 747. Being more or less skeptical of a certain category of witness does

not make a prospective juror challengeable for cause. *Id.* Further, a prospective juror's inclination to give certain classes of witnesses a slight edge in terms of credibility does not justify a challenge for cause. *Ladd v. State*, 3 S.W.3d 547, 560 (Tex. Crim. App. 1999).

After defense counsel asked whether any of the potential jurors "feels like if it comes down to what a police officer says and what someone else says, that the police officer is going to get the benefit of the doubt even if it's a slight benefit," the following discussion occurred:

> PROSPECTIVE JUROR: Me.
>
> [DEFENSE COUNSEL]: Okay. And that's Ms. Peterson? Yes, ma'am, you said you're married to a police officer.
>
> PROSPECTIVE JUROR: No, not anymore, but I was for 15 years.
>
> [DEFENSE COUNSEL]: You understand what all they have to go through and all the training and stuff like that?
>
> PROSPECTIVE JUROR: Yeah.
>
> [DEFENSE COUNSEL]: And in today's world, we all understand cops have the hardest job there is. They're accused of doing bad stuff all the time.
>
> PROSPECTIVE JUROR: Yes, sir.
>
> [DEFENSE COUNSEL]: We see it on the 24-hour news network all the time. All the time. And, basically, what I'm hearing from you is it's your opinion that -- correct me if I'm wrong, but I don't want to misstate what you're saying, but if it came down to what one witness had to say and what a police officer had to say, if there's a conflict

you're going to go with the police officer based on his occupation basically?

        PROSPECTIVE JUROR: Yes, sir.

The record does not clearly reflect that all of these "prospective juror" statements were made by Peterson. But even assuming all the statements were made by Peterson, the statements were based on counsel's premise that Peterson was going to give the benefit of the doubt to a police officer "even if it's a slight benefit." Peterson, therefore, did not express any extreme or absolute positions regarding police officers' credibility. *See Buntion*, 482 S.W.3d at 98 (explaining that the tendency to believe police officers over civilian witnesses did not make a veniremember challengeable for cause). The trial court, therefore, did not abuse its discretion in denying Appellant's challenge for cause as to Peterson on the only grounds that Appellant challenges on appeal.[5]

*Roger Moore*

Appellant contends that the trial court erroneously denied his challenge for cause against potential juror Roger Moore because Moore "made multiple biased statements." Appellant first asserts that Moore demonstrated bias by stating that Moore could not follow the law if it conflicted with God's law or moral law and that Moore would hold it against Appellant if he exercised his constitutional right to remain silent. Appellant refers to the following discussion with the prosecutor during voir dire:

        PROSPECTIVE JUROR: I think moral law trumps state law.

---

[5]Appellant also challenged Peterson on the ground that she could not follow an Article 38.23 instruction. We have determined that the trial court did not err in overruling any of Appellant's challenges for cause based upon an Article 38.23 instruction.

18

[PROSECUTOR]: Yes, sir.

PROSPECTIVE JUROR: If you're accused of something you should stand up and give witness to it.

PROSPECTIVE JUROR: That's right.

PROSPECTIVE JUROR: That's what Biblical law says, so I struggle with that being a youth pastor that that's what I see.

[PROSECUTOR]: Yes, sir.

PROSPECTIVE JUROR: It's easy to say that until you're the person sitting on the other side.

[PROSECUTOR]: Well, and I get that, and I know you get where I'm coming from, too. But would you if you're selected, or you, too, Mr. Dennis, if you're selected to serve on this jury, would you be able to promise the Court that you just will not consider it at all against the defendant -- you just won't consider it at all if he decides not to testify? This is the only time we get to ask you questions.

PROSPECTIVE JUROR: I have a hard time with that.

[PROSECUTOR]: Sure.

. . . .

[PROSECUTOR]: Uh-huh. Okay. If you guys are selected, either one of you Mr. Dennis or Mr. Moore, would you be able to follow that law and just base your verdict on the evidence that's presented to you in the law of the case, which includes the right to remain silent for the defendant? I get a yes, a nodded yes from you, Mr. Moore?

PROSPECTIVE JUROR: Yes.

PROSPECTIVE JUROR: Yes, probably so.

19

Again, it is not clear whether all the statements by "prospective juror" above were made by Moore, as opposed to Dennis or another prospective juror. However, even assuming that Moore made all of the statements regarding God's law and moral law, Appellant failed to show that Moore understood the requirements of the law and could not overcome his bias or prejudice well enough to follow the law. *Buntion*, 482 S.W.3d at 84. To the extent that Moore's answers were vacillating, unclear, or contradictory, we afford particular deference to the trial court's decision. *Id.* Additionally, the record indicates that Moore nodded his head "yes" and either responded, "Yes" or "Yes, probably so," when asked if he could "just base [his] verdict on the evidence that's presented" and follow "the law of the case, which includes [Appellant's] right to remain silent." *See id.* at 90 (stating that the trial court did not err in denying a challenge for cause to a potential juror who indicated that "a defendant in a criminal case should be required to present some evidence to prove his innocence" but also "understood that she could not draw any inferences or assumptions from a defendant's failure to testify or present evidence"). Accordingly, Moore ultimately agreed that he could follow the law if selected to be a juror.

Appellant also asserts that Moore demonstrated bias by stating that he could not follow an Article 38.23 instruction. We have determined that the trial court did not err in overruling any of Appellant's challenges for cause based upon an Article 38.23 instruction. The trial court did not abuse its discretion in denying Appellant's challenge for cause as to Moore.

*Bradley Overcash*

Appellant asserts that the trial court improperly denied his challenge for cause against potential juror Bradley Overcash because Overcash had prejudged the case.

20

Overcash stated that he "work[ed] at City Hall at the records department" and was "familiar with the details of the case" because he had already read the police report. The prosecutor then asked him if he had formed an opinion about what the verdict should be in the case, and Overcash responded, "Yes." However, when asked whether he "could set aside anything that [he] might have heard about this case" before the trial and "just base [his] verdict on what [he] hear[s] from the witness stand in this case and the exhibits and the evidence that's introduced," Overcash responded that he could. The record does not establish that Overcash's statements demonstrate bias or prejudice against Appellant. *See* CRIM. PROC. art. 35.16(a)(9); *Brown v. State*, 913 S.W.2d 577, 580 (Tex. Crim. App. 1996) (explaining that venirepersons who ultimately state that they "can follow the law" are not challengeable for cause). The trial court did not abuse its discretion in denying Appellant's challenge for cause against Overcash.

*Shonna Butler*

Finally, Appellant asserts that the trial court erred by denying his challenge for cause against potential juror Shonna Butler because Butler stated that she would require defense counsel to prove his client's innocence, that she could not disregard illegally obtained evidence, and that she would defer to a police officer's testimony. While Appellant points to various places in the record where Butler may have provided responses to voir dire questions, Appellant only challenged Butler for cause on the basis that she could not follow an Article 38.23 instruction. Thus, a challenge for cause based upon Article 38.23 is the only ground preserved for appellate review with respect to Butler. *See* TEX. R. APP. P. 33.1. We have determined that the trial court did not err in overruling any of Appellant's challenges for cause based upon an Article 38.23 instruction.

Appellant has failed to establish that the trial court erred in denying his challenges for cause to any of the fifteen prospective jurors. *See Buntion*, 482 S.W.3d at 104. Therefore, we overrule Appellant's second issue.

*This Court's Ruling*

We affirm the judgment of the trial court.

JOHN M. BAILEY
CHIEF JUSTICE

October 10, 2019

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[6]

Willson, J., not participating.

---

[6]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.